# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
June 2, 2016 Session,[1] Heard at Lipscomb University

## REGINALD DION HUGHES v. TENNESSEE BOARD OF PROBATION AND PAROLE

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Davidson County**
**No. 14-884-III          Ellen H. Lyle, Chancellor**

_____

**No. M2015-00722-SC-R11-CV**
**Filed March 23, 2017**

_____

The petition for writ of certiorari of Reginald Dion Hughes ("petitioner") to the chancery court from the Tennessee Board of Probation and Parole's denial of parole was dismissed pursuant Tennessee Code Annotated section 41-21-812 following the discovery that petitioner still owed $258.58 from prior cases. Petitioner appealed the chancery court's decision, but the Court of Appeals also dismissed the appeal pursuant to Tennessee Code Annotated section 41-21-812. *Hughes v. Tenn. Bd. Prob. and Parole*, No. M2015-00722-COA-R3-CV (Tenn. Ct. App. July 1, 2015) (order dismissing appeal), *perm. app. granted* (Tenn. Feb. 2, 2016). Petitioner then requested permission to appeal to this court, alleging that section 41-21-812 was unconstitutional. We granted petitioner's request to review this case and to determine "[w]hether Tennessee Code Annotated section 41-21-812(a) is constitutional as applied to this case." After reviewing the record, the parties' arguments, and the applicable law, we affirm the judgment of the Court of Appeals and dismiss petitioner's appeal.

### Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed, Case Dismissed

ROGER A. PAGE, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, C.J., and HOLLY KIRBY, J., joined. CORNELIA A. CLARK and SHARON G. LEE, JJ., filed separate dissenting opinions.

David H. Veile,[2] Franklin, Tennessee, for the petitioner, Reginald D. Hughes.

---

[1] We heard oral argument in this case on June 2, 2016, at Lipscomb University in Nashville, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Pamela S. Lorch, Senior Counsel; Michael C. Polovich, Assistant Attorney General (on appeal); Lee Pope, Assistant Attorney General (in chancery court), for the appellee, Tennessee Board of Probation and Parole.

**OPINION**

**I. Facts and Procedural History**

In 1987, petitioner was convicted of two counts of second-degree murder and received a thirty-year sentence on each count, to be served consecutively, for an effective sentence of sixty years. His convictions and sentences were upheld on direct appeal. *State v. Hughes*, No. 96, 1988 WL 132698, at *3 (Tenn. Crim. App. Dec. 14, 1988). Petitioner later unsuccessfully sought post-conviction relief. *Hughes v. State*, No. 02C01-9201-CR-00005, 1992 WL 368651, at *3 (Tenn. Crim. App. Dec. 16, 1992). Petitioner first became eligible for parole on June 20, 2003, but the Tennessee Board of Probation and Parole denied parole after a hearing. *Hughes v. Tenn. Bd. of Parole*, No. W2005-00838-COA-R3-CV, 2005 WL 3479632, at *1 (Tenn. Ct. App. Dec. 20, 2005). He again became eligible for parole on August 22, 2005, but the Tennessee Board of Probation and Parole denied parole after a hearing. Petitioner also filed three petitions for writ of habeas corpus, all of which were denied. *Hughes v. Barbee*, No. W2012-01767-CCA-R3-HC, 2013 WL 3818108, at *1 (Tenn. Crim. App. July 19, 2013); *Hughes v. Parker*, No. W2007-02022-CCA-R3-HC, 2008 WL 1722454, at *1 (Tenn. Crim. App. Apr. 14, 2008); *Hughes v. Mills*, No. W2003-02486-CCA-R3-HC, 2004 WL 547010, at *1 (Tenn. Crim. App. Mar. 19, 2004).

The current appeal arose from the Tennessee Board of Probation and Parole's third denial of parole. In 2011, petitioner again became eligible for parole, but he was denied parole after a hearing on August 18, 2011. Petitioner appealed the denial to the Tennessee Board of Probation and Parole but was denied relief. He then filed a petition for common law writ of certiorari in the Lauderdale County Chancery Court, which was later transferred to the Davidson County Chancery Court. On January 20, 2015, the Tennessee Board of Probation and Parole filed a motion to dismiss pursuant to Tennessee Code Annotated section 41-21-812,[3] asserting that petitioner's claim should be dismissed

---

[2] The Court is grateful to attorney David H. Veile of the law firm of Schell & Oglesby, LLC, for providing petitioner with outstanding representation in this appeal.

[3] Tennessee Code Annotated section 41-21-812 states:

because he had "outstanding unpaid costs from prior lawsuits." The State, relying on an affidavit from the Clerk and Master of the Lauderdale County Chancery Court, asserted that petitioner owed court costs of $49.50 from a prior divorce case in which he was the plaintiff and $209.35 from his prior case against the Tennessee Board of Probation and Parole. The chancery court granted the State's motion on March 16, 2015, because petitioner had a total of $258.85 in unpaid court costs from the two prior lawsuits.[4] Petitioner appealed the chancery court's decision, but the Court of Appeals also dismissed the appeal pursuant to Tennessee Code Annotated section 41-21-812. *Hughes v. Tenn. Bd. Prob. & Parole*, No. M2015-00722-COA-R3-CV (Tenn. Ct. App. July 1, 2015) (order dismissing appeal), *perm. app. granted* (Tenn. Feb. 2, 2016). We now consider petitioner's appeal.

## II. Analysis

Petitioner raises one core argument under several provisions of the United States Constitution and the Tennessee Constitution, all of which address his right of access to the courts. Petitioner asserts that the trial court's application of Tennessee Code Annotated section 41-21-812 and dismissal of his case due to an outstanding fee of

---

(a) Except as provided by subsection (b), on notice of assessment of any fees, taxes, costs and expenses under this part, a clerk of a court may not accept for filing another claim by the same inmate until prior fees, taxes, costs and other expenses are paid in full.

(b) A court may allow an inmate who has not paid any costs or expenses assessed against the inmate to file a claim for injunctive relief seeking to enjoin an act or failure to act that creates a substantial threat of irreparable injury or serious physical harm to the inmate.

[4] After a thorough review of the record, we note that the order in the appellate record from petitioner's prior case against the Tennessee Board of Probation and Parole fails to assess costs; therefore, it is unclear under what authority the outstanding balance of $209.35 was imposed. However, even if the $209.35 was not properly assessed or petitioner was not notified of the unpaid balance, we conclude that the $49.50 from the prior divorce action was properly considered an outstanding unpaid cost. The order dismissing the divorce action properly assessed costs to petitioner, and petitioner received notice of the fee when the order was mailed to him while incarcerated. Furthermore, we conclude that the absence of an affidavit of inability to pay in the record for the prior divorce case is not determinative. We note that there was a letter from the petitioner in the record stating that he was indigent and that the affidavit from the Clerk and Master from the Lauderdale County Chancery Court states that he proceeded in forma pauperis in the divorce action. In addition, we conclude that the mandate in Tennessee Code Annotated section 41-21-802 that the section only applies to claims in which "an affidavit of inability to pay costs is filed with the claim by the inmate" means that the current action has to be filed with an affidavit of indigency, not the prior claim from which petitioner still owes fees. Therefore, Tennessee Code Annotated section 41-21-812 was applicable to petitioner based on the unpaid outstanding fee of $49.50.

- 3 -

$258.85 violated his right of access to the courts pursuant to the Due Process and Equal Protection provisions of the United States Constitution[5] and the Equal Protection, Due Process, and Open Courts provisions of the Tennessee Constitution.[6] Petitioner specifically asserts an as-applied constitutional challenge. "In contrast to a facial challenge, which involves the constitutionality of the statute as written, '[a]n 'as applied' challenge to the constitutionality of a statute is evaluated considering how it operates in practice against the particular litigant and under the facts of the instant case, not hypothetical facts in other situations.'" *State v. Crank*, 468 S.W.3d 15, 24 n.5 (Tenn. 2015) (quoting *City of Memphis v. Hargett*, 414 S.W.3d 88, 107 (Tenn. 2013)). Therefore, our analysis is limited to how the application of Tennessee Code Annotated section 41-21-812 affects the petitioner specifically.

When analyzing the constitutionality of a statute, we review the issue de novo with no presumption of correctness to the lower court's legal conclusions. *Waters v. Farr*, 291 S.W.3d 873, 882 (Tenn. 2009) (citing *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 836 (Tenn. 2008)). We are "charged with upholding the constitutionality of statutes where possible," *State v. Pickett*, 211 S.W.3d 696, 700 (Tenn. 2007), and we always "begin with the presumption that an act of the General Assembly is constitutional," *Gallaher v. Elam*, 104 S.W.3d 455, 459 (Tenn. 2003) (citing *State v. Robinson,* 29 S.W.3d 476, 479 (Tenn. 2000); *Riggs v. Burson,* 941 S.W.2d 44, 51 (Tenn. 1997)). "In a

---

[5] Petitioner also briefly asserts that the First Amendment protects his right of access to the courts in this case. Some cases have included the First Amendment as part of the following access-to-courts analysis pursuant to the petition clause of the First Amendment of the United States Constitution while others rely strictly on due process and equal protection. *Bourough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387 (2011); *Lewis v. Casey*, 518 U.S. 343, 365-67 (1996) (Thomas, J., concurring); s*ee also* TENN. CONST. art. I, § 23. To the extent that petitioner argues that he has a freestanding First Amendment claim independent of the following analysis, we conclude that petitioner is without relief. As noted below, even if petitioner remains unable to pay the $258.85 due, petitioner still retains access to the administrative remedies provided by the Tennessee Board of Probation and Parole. Furthermore, the State's "refusal to subsidize a prisoner's exercise of his First Amendment rights does not constitute a violation of those rights." *Hampton v. Hobbs*, 106 F.3d 1281, 1286 (6th Cir. 1997) (citing *Regan v. Taxation with Representation*, 461 U.S. 540, 545-46 (1983)) (discussing the fee requirements of the Prison Litigation Reform Act and concluding the fee requirements did not violate the prisoner's First Amendment rights). We conclude that Tennessee Code Annotated section 41-21-812 does not violate petitioner's First Amendment rights.

[6] Petitioner also asserts that Tennessee Code Annotated section 41-21-807(b)(4) should have operated to prevent his petition from being dismissed. Section 41-21-807(b)(4) states, "In no event shall an inmate be prohibited from bringing a civil action or appealing a civil or criminal judgment for the reason that the inmate has no assets and no means by which to pay the initial partial filing fee." However, this section is inapplicable to the case at bar. Section 41-21-807(b)(4) addresses the ability to pay the partial filing fee required to file the current action. It does not address the scenario of outstanding fees from past cases. That situation is strictly the province of Tennessee Code Annotated section 41-21-812. Therefore, petitioner's argument is without merit.

civil case heard without a jury, the trial court's findings of fact are reviewed de novo, accompanied by a presumption of correctness, unless the evidence preponderates otherwise." *Hood v. Jenkins*, 432 S.W.3d 814, 822 (Tenn. 2013) (citations omitted).

Tennessee Code Annotated section 41-21-812 states:

(a) Except as provided by subsection (b), on notice of assessment of any fees, taxes, costs and expenses under this part, a clerk of a court may not accept for filing another claim by the same inmate until prior fees, taxes, costs and other expenses are paid in full.

(b) A court may allow an inmate who has not paid any costs or expenses assessed against the inmate to file a claim for injunctive relief seeking to enjoin an act or failure to act that creates a substantial threat of irreparable injury or serious physical harm to the inmate.

This section only applies to "a claim brought by an inmate in general sessions or a trial level court of record in which an affidavit of inability to pay costs is filed with the claim by the inmate."[7]  Tenn. Code Ann. § 41-21-802.  A claim is defined as "any lawsuit or appeal filed by an inmate except a petition for post-conviction relief."  *Id.* § 41-21-801(1).  An inmate is defined as "a person housed in a facility operated by the department, housed in a county jail or housed in a correctional facility operated by a private corporation pursuant to a contract with the state or local government."  *Id.* § 41-21-801(4).

The Sixth Circuit has recently addressed the constitutionality of section 41-21-812 in *Clifton v. Carpenter*, 775 F.3d 760, 762 (6th Cir. 2014), and concluded that the statute was unconstitutional as applied in that case.  *Id.* at 768.  In *Clifton*, the petitioner was a parolee whose parole was revoked by the parole board.  *Id.* at 762.  When the petitioner attempted to appeal this decision to the chancery court and the Tennessee Court of Appeals, the clerk's offices refused to file the petition because he owed $1,449.15 in prior court costs.  *Id.*  Recognizing that the petitioner had a liberty interest at stake in the revocation of parole and asserting that "[a]ccess to the courts cannot be contingent on wealth," the Sixth Circuit found section 41-21-812 unconstitutional as applied.  *Id.* at 767-68.  While informative, *Clifton* is not determinative of the case at bar.[8]  As the court

---

[7] Neither party has argued that this statute fails to authorize appellate dismissal for failure to pay outstanding costs; therefore, we will not address that issue in this opinion.

[8] We also note that "[t]hough they are persuasive authority when interpreting the United States Constitution, this Court is not bound by decisions of the federal district and circuit courts. We are bound only by decisions of the United States Supreme Court."  *State v. Carruthers*, 35 S.W.3d 516, 561 n.45

in *Clifton* recognized, the petitioner in that case had a liberty interest at stake in the revocation of his parole. However, in this case, petitioner was already imprisoned and was requesting early release. "There is a crucial distinction between being deprived of a liberty one has, as in parole, and being denied a conditional liberty that one desires." *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 9 (1979). While the revocation of parole involves the removal of a liberty interest, "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Id.* at 7. Therefore, because different interests are at stake in this case than in *Clifton*, we conclude that *Clifton* is not controlling and proceed with a comprehensive analysis of petitioner's interests and rights pursuant to the United States and Tennessee Constitutions.

## A. Right of Access to Courts

The right of access to courts was first recognized in *Ex parte Hull*, 312 U.S. 546 (1941), when the Court struck down a provision that prohibited prisoners from filing habeas corpus petitions unless the petition was found to be "properly drawn" by an investigator from the parole board. *Id.* at 549. Since *Hull*, the United States Supreme Court has recognized that this right stems from multiple provisions of the United States Constitution. While some Courts have relied on the Privileges and Immunities Clause, U.S. CONST. art. IV, § 2, cl. 1; *Chambers v. Baltimore & Ohio R.R. Co.*, 207 U.S. 142, 154 (1907) (Harlan, J., dissenting), and the First Amendment's right of petition, U.S. CONST. amend. I; *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972), the analysis utilized in most access-to-courts cases appears to be grounded in the Due Process and Equal Protection provisions of the Fourteenth Amendment, U.S. CONST. amend. XIV, § 1; *M.L.B. v. S.L.J.*, 519 U.S. 102, 120 (1996) (citing multiple equal protection and due process cases). Therefore, we will address petitioner's assertions utilizing due process and equal protection principles.[9]

---

(Tenn. 2000) (citing *Strouth v. State*, 999 S.W.2d 759, 769 n. 9 (Tenn. 1999); *State v. McKay*, 680 S.W.2d 447, 450 (Tenn. 1984)).

[9] We note that petitioner also cited to *Whisnant v. Byrd*, 525 S.W.2d 152 (Tenn. 1975), and *Logan v. Winstead*, 23 S.W.3d 297, 302 (Tenn. 2000), to assert that this court has stated that prisoners have a constitutional right to institute and prosecute a civil action. However, in *Whisnant*, that court stated:

> [A] prisoner has a constitutional right to institute and prosecute a civil action seeking redress for injury or damage to his person or property, or for the vindication of any other legal right; *however, this is a qualified and restricted right.*

> We quote with approval the following language from *Tabor v. Hardwick*, 224 F.2d 526 (5th Cir. 1955):

Generally, due process and equal protection analyses merit separate consideration. However, the United States Supreme Court has stated that in the right-of-access-to-courts analysis, the equal protection and due process principles converge. *M.L.B.*, 519 U.S. at 120 (citing *Bearden v. Georgia*, 461 U.S. 660, 665 (1983)).

> The equal protection concern relates to the legitimacy of fencing out would-be appellants based solely on their inability to pay core costs. The due process concern homes in on the essential fairness of the state-ordered proceedings anterior to adverse state action. A "precise rationale" has not been composed . . . because cases of this order "cannot be resolved by resort to easy slogans or pigeonhole analysis," . . . .

*Id.* (citations omitted); *see also Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002) (citing the many cases and constitutional provisions on which the Court has based the right of access to courts); *Lewis v. Casey*, 518 U.S. 343, 367 (1996) (Thomas, J., concurring) (noting the Court's "inability . . . to agree upon the constitutional source of the supposed right" of access to the courts); *Bearden*, 461 U.S. at 665-67. As such, we will address both the due process and equal protection concerns simultaneously.

Both the United States and Tennessee Constitutions protect the right to due process of law. Section 1 of the Fourteenth Amendment to the United States Constitution provides, "No State shall make or enforce any law which . . . deprive[s] any person of life, liberty, or property, without due process of law . . . ." Article I, section 8 of the

---

> (W)e think that the principle of the cases [relating to restraint of personal liberty] should not be extended to give them an absolute and unrestricted right to file any civil action they may desire. Otherwise, penitentiary wardens and the courts might be swamped with an endless number of unnecessary and even spurious lawsuits filed by inmates in remote jurisdictions in the hope of obtaining leave to appear at the hearing of any such case, with the consequent disruption of prison routine and concomitant hazard of escape from custody. As a matter of necessity, however regrettable the rule may be, it is well settled that, "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356. 224 F.2d at 529.

*Whisnant*, 525 S.W.2d at 153 (emphasis added). *Logan* further limited *Whisnant* by holding that while prisoners have a constitutional right to initiate and prosecute civil actions, "they do not retain an absolute right to have civil litigation held in abeyance until they are released from custody, nor do they retain an absolute right to be present at each stage of the proceedings." *Logan*, 23 S.W.3d at 302. Similarly, while we agree that petitioner has a constitutional right to initiate a civil proceeding, this is a qualified and limited right, which does not allow petitioner to file any civil action he desires irrespective of financial obligations and outstanding fees.

Tennessee Constitution states, "[N]o man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers, or the law of the land." We have determined that this provision of the Tennessee Constitution is "synonymous" with the Due Process Clause of the Fourteenth Amendment. *Gallaher*, 104 S.W.3d at 463 (citing *Riggs*, 941 S.W.2d at 51).

Similarly, the equal protection of the laws is also guaranteed by both the United States and Tennessee Constitutions. Section 1 of the Fourteenth Amendment to the United States Constitution provides, "No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." There are also two provisions of the Tennessee Constitution that encompass the equal protection guarantee. Article I, section 8, which is set out above, and Article XI, section 8, which provides:

> The Legislature shall have no power to suspend any general law for the benefit of any particular individual, nor to pass any law for the benefit of individuals inconsistent with the general laws of the land; nor to pass any law granting to any individual or individuals, rights, privileges, immunitie[s], or exemptions other than such as may be, by the same law extended to any member of the community, who may be able to bring himself within the provisions of such law.

This Court has concluded that Article I, section 8 and Article XI, section 8 of the Tennessee Constitution provide "essentially the same protection" as the Equal Protection Clause of the United States Constitution. *Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 152 (Tenn. 1993). Moreover, when analyzing the merit of an equal protection challenge, this Court has utilized the three levels of scrutiny—strict scrutiny, heightened scrutiny, and reduced scrutiny, which applies a rational basis test—that are employed by the United States Supreme Court depending on the right that is asserted. *State v. Tester*, 879 S.W.2d 823, 828 (Tenn. 1994) (citations omitted). "Strict scrutiny applies when the classification at issue: (1) operates to the peculiar disadvantage of a suspect class; or (2) interferes with the exercise of a fundamental right." *Gallaher*, 104 S.W.3d at 460 (citation omitted). Heightened scrutiny applies to cases of state sponsored gender discrimination. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)); *Mitchell v. Mitchell*, 594 S.W.2d 699, 701 (Tenn. 1980). Reduced scrutiny, applying a rational basis test, applies to all other equal protection inquiries and examines "whether the classifications have a reasonable relationship to a legitimate state interest." *Tenn. Small Sch. Sys.*, 851 S.W.2d at 153 (quoting *Doe v. Norris*, 751 S.W.2d 834, 841 (Tenn. 1988)).

Two lines or categories of cases have emerged in the due process and equal protection areas that define the parameters of a person's right of access to courts. Each set of cases addresses the issue of when and under what circumstances a state can place limits on an indigent person's right of access to the courts. For ease of reference, we will refer to the two diverging sets of cases as the *Griffin*[10] cases and the *Boddie*[11] cases.

## 1. The *Griffin* Cases

The first line of cases, while broad in remedy, has limited applicability. The seminal case is *Griffin v. Illinois*, 351 U.S. 12 (1956). *Griffin* addressed the issue of requiring transcript fees for indigent prisoners who were not charged with a capital offense.[12] *Id.* at 13-16. The Court stated that "[b]oth equal protection and due process emphasize the central aim of our entire judicial system—all people charged with [a] crime must, so far as the law is concerned, stand on an equality before the bar of justice in every American court." *Id.* at 17 (citations and internal quotation marks omitted). The Court concluded that when a state made appellate review available, it could not then deny indigent persons that review simply because of their inability to pay the costs in advance. *Id.* at 18. "*Griffin* does not represent a balance between the needs of the accused and the interests of society; its principle is a flat prohibition against pricing indigent defendants out of as effective an appeal as would be available to others able to pay their own way." *Mayer v. Chicago*, 404 U.S. 189, 196-97 (1971).

The Court later extended the principles espoused in *Griffin* to transcript fees in cases involving violations of a city ordinance, *see Mayer v. Chicago*, 404 U.S. 189, 191, 193-96 (1971); a $20 filing fee required by the Supreme Court of Ohio in a first tier criminal appeal, *see Burns v. Ohio*, 360 U.S. 252, 255-58 (1959); a $4 filing fee in a habeas corpus proceeding, *see Smith v. Bennett*, 365 U.S. 708, 708 n.1, 714 (1961); the right to counsel in a first tier appeal, *see Douglas v. California*, 372 U.S. 353, 355-58 (1963); and the ability of inmates to assist one another in preparing habeas corpus petitions, *see Johnson v. Avery*, 393 U.S. 483, 486, 490 (1969), which was later extended to the preparation of civil rights actions, *see Wolff v. McDonnell*, 418 U.S. 539, 579-80 (1974). However, the Court determined that indigent defendants do not have a right to appointed counsel for discretionary appeals. *Ross v. Moffitt*, 417 U.S. 600, 621 (1974).

---

[10] Referring to the pivotal case of *Griffin v. Illinois*, 351 U.S. 12 (1956).

[11] Referring to the formative case of *Boddie v. Connecticut*, 401 U.S. 371 (1971).

[12] By statute, indigent defendants sentenced to death were granted a free transcript at the expense of the county where they were convicted. *Griffin*, 351 U.S. at 14.

Petitioner urges us to apply the *Griffin* cases and conclude that Tennessee Code Annotated section 41-21-812(a) is unconstitutional as applied because in *Bounds v. Smith*, the United States Supreme Court, relying on the *Griffin* cases, stated that the right of access to courts was a fundamental right. 430 U.S. 817, 828 (1977). However, the United States Supreme Court in *Lewis* warned against extending the principles of the *Griffin/Bounds* cases to the generality of civil cases. *Lewis*, 518 U.S. at 354-55. The court limited the language of *Bounds* and explained that "several statements in *Bounds* went beyond the right of access recognized in the earlier cases on which it relied, which was a right to bring to court a grievance that the inmate wished to present." *Id.* at 354; *see also Bounds*, 430 U.S. at 840 (Rehnquist, J., dissenting) (stating that the "'fundamental constitutional right of access to the courts'" that the majority announced in *Bounds* was "created virtually out of whole cloth with little or no reference to the Constitution from which it is supposed to be derived"). The Court further explained that the *Bounds* access-to-court cases were limited to direct appeals from convictions, collateral appeals related to a conviction, and civil rights actions. *Id*. at 354-55. The court concluded:

> In other words, *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis*, 518 U.S. at 355. Therefore, petitioner's reliance on *Bounds* is misplaced. Petitioner's claim does not fit into one of the narrow categories of cases—direct appeals from convictions, collateral appeals related to a conviction, and civil rights actions—to which *Lewis* limited the *Griffin/Bounds* line of cases; therefore, he is not entitled to relief on this basis.

### 2. The *Boddie* Cases

In contrast to the *Griffin* cases, there is a separate set of civil cases in which the United States Supreme Court has relied on a more traditional equal protection and due process analysis and recognized that parties have a right to access the courts irrespective of their ability to pay. The watershed case is *Boddie v. Connecticut*, 401 U.S. 371 (1971). In *Boddie*, two welfare recipients could not afford to pay the court fees and costs of service of process to obtain a divorce. *Id*. at 372-73. Relying on due process principles, the Court concluded that a state could not deny a married couple the ability to divorce

based on their inability to pay court costs. *Id.* at 374. Noting that the only way to obtain a divorce was through the judicial system, the Court explained that "due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." *Id.* at 377. Crucial to the Court's holding was the fundamental interest of marriage. *Id.* at 374; *see M.L.B.*, 519 U.S. at 113. In announcing the decision of the Court, the majority stated:

> We do not decide that access for all individuals to the courts is a right that is, in all circumstances, guaranteed by the Due Process Clause of the Fourteenth Amendment so that its exercise may not be placed beyond the reach of any individual, for, as we have already noted, in the case before us this right is the exclusive precondition to the adjustment of a fundamental human relationship.

*Boddie*, 401 U.S. at 382-83.

In contrast, the Court in *United States v. Kras*, 409 U.S. 434 (1973), concluded that unlike in *Boddie*, where a fundamental interest in marriage was implicated, the petitioner in *Kras*, who was unable to pay the fees associated with a discharge of debt in bankruptcy, did not have a fundamental interest in the availability of a discharge of debt. *Id.* at 445-46. The Court also noted that "[i]n contrast with divorce, bankruptcy is not the only method available to a debtor for the adjustment of his legal relationship with his creditors. The utter exclusiveness of court access and court remedy, as has been noted, was a potent factor in *Boddie*." *Id.* at 445. The bankruptcy fee requirement was also not a violation of equal protection because rather than bankruptcy being related to a fundamental interest in constitutional jurisprudence, like marriage, it was a regulation on economics and social welfare that is analyzed under a rational basis standard. *Id.* at 446. The Court concluded that charging an indigent litigant bankruptcy fees when attempting to discharge debt in bankruptcy proceedings satisfied the rational basis standard. *Id.* at 447-49.

Similarly, in *Ortwein v. Schwab*, 410 U.S. 656 (1973), welfare recipients were unable to pay a $25 filing fee in the appellate courts to challenge an agency determination reducing welfare benefits. *Id.* at 656-58. Equating the case to *Kras*, the Court concluded that the interest in welfare benefits "has far less constitutional significance than the interest of the *Boddie* appellants." *Id.* at 659. The Court also concluded that there was no equal protection violation because the regulation was in the area of economics and social welfare, which is analyzed under a rational basis justification, and that there was a rational basis for the fee. *Id.* at 660. *Ortwein* made clear that the United States Supreme Court "has not extended *Griffin* to the broad array of civil cases. But tellingly, the Court

- 11 -

has consistently set apart from the mine run of cases those involving state controls or intrusions on family relationships." *M.L.B.*, 519 U.S. at 116; s*ee also Dungan v. Dungan*, 579 S.W.2d 183, 185 (Tenn. 1979) (concluding that the state was not required to pay for newspaper publications for indigent plaintiffs in divorce cases but that the clerk could mail a copy of the complaint and summons to the defendant's last known address and post a copy of the summons in three public places within the county).

In contrast, in *M.L.B.*, the Court struck down Mississippi's requirement that a party pay in advance record preparation fees for an appeal following the termination of the party's parental rights to her two minor children. *Id.* at 106-07. The Court compared *Mayer*, a case applying the *Griffin* line of cases to a transcript fees requirement in cases involving violations of a city ordinance, and *Ortwein*, a case applying the *Boddie* line to a filing fee requirement for welfare recipients who were seeking to challenge a reduction of their welfare benefits, and concluded that because of the nature of the proceeding—terminating a person's parental rights—that the case was more analogous to *Mayer*. *Id.* at 119-24. In making this conclusion, the Court stated that M.L.B. was

> endeavoring to defend against the State's destruction of her family bonds, and to resist the brand associated with a parental unfitness adjudication. Like a defendant resisting criminal conviction, she seeks to be spared from the State's devastatingly adverse action. That is the very reason we have paired her case with *Mayer*, not with *Ortwein* or *Kras* . . . .

*Id.* at 125. The court further elucidated:

> In aligning M. L. B.'s case and *Mayer*—parental status termination decrees and criminal convictions that carry no jail time—for appeal access purposes, we do not question the general rule, stated in *Ortwein*, that fee requirements ordinarily are examined only for rationality. *See supra*, at 563. The State's need for revenue to offset costs, in the mine run of cases, satisfies the rationality requirement, *see Ortwein*, 410 U.S., at 660, 93 S. Ct., at 1174-1175; States are not forced by the Constitution to adjust all tolls to account for "disparity in material circumstances." *Griffin*, 351 U.S., at 23, 76 S.Ct., at 592 (Frankfurter, J., concurring in judgment).

> But our cases solidly establish two exceptions to that general rule. The basic right to participate in political processes as voters and candidates cannot be limited to those who can pay for a license. Nor may access to judicial processes in cases criminal or "quasi criminal in nature," *Mayer*, 404 U.S., at 196, 92 S. Ct., at 415 (citation and internal quotation marks omitted), turn on ability to pay. In accord with the substance and sense of

- 12 -

our decisions in *Lassiter* and *Santosky*, *see supra*, at 564-566, we place decrees forever terminating parental rights in the category of cases in which the State may not "bolt the door to equal justice," *Griffin*, 351 U.S., at 24, 76 S. Ct., at 593 (Frankfurter, J., concurring in judgment); *see supra*, at 560-561.

*Id.* at 123-24.

Considering this prior legal precedent, we conclude that this case is more analogous to *Kras* and *Ortwein* than it is to *Boddie* and *M.L.B.* because of the nature of the case and the underlying interests involved.

The Court has stated that the right of access to the courts "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). Therefore, in *Boddie*, the determinate factors were that the parties, who were welfare recipients, were seeking to end the fundamental human relationship of marriage but could only do so through the court system. *Boddie*, 401 U.S. at 372-83. Similarly, in *M.L.B.*, the appellant was seeking review of the termination of her parental rights, a proceeding that was quasi-criminal in nature and dealt with the permanent end to a fundamental relationship between a mother and her children. *M.L.B.*, 519 U.S. at 125.

In contrast, petitioner's claim is an assertion that he should have received parole. A prisoner has no constitutional or fundamental right to be released on parole before the expiration of a valid sentence. *Greenholtz,* 442 U.S. at 7. "A protected liberty interest in parole exists only where the statute creates an expectation of parole." *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005) (citing *Greenholtz*, 442 U.S. at 11). While at one time the Tennessee parole scheme created a liberty interest in parole, *see Mayes v. Trammell*, 751 F.2d 175 (6th Cir. 1984), the Tennessee Legislature amended the parole regime in 1985 to remove any entitlement to parole, therefore removing any liberty interest in parole. *Wright v. Trammell*, 810 F.2d 589, 590-91 (6th Cir. 1987); *Ritchie v. Tenn. Bd. of Prob. & Parole*, No. 1:10-CV-203, 2012 WL 222923, at *2 (E.D. Tenn. Jan. 25, 2012). Tennessee Code Annotated section 40-28-117(a)(1) states:

Parole being a privilege and not a right, no prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the board is of the opinion that there is reasonable probability that the prisoner, if released, will live and remain at liberty without violating the law, and that the prisoner's release is not incompatible with the welfare of society.

*See also* Tenn. Code Ann. § 40-35-501 (stating that "only inmates with felony sentences of more than two (2) years or consecutive felony sentences equaling a term greater than two (2) years shall be *eligible for* parole consideration" (emphasis added)). Similar to the discharge of bankruptcy in *Kras*, parole is a matter of legislative grace. *See Greenhotz*, 442 U.S. at 11; *Biederman v. Commonwealth*, 434 S.W.3d 40, 46 (Ky. 2014) (quoting *Land v. Commonwealth*, 986 S.W.2d 440, 442 (Ky.1999)) (stating that "'parole is a matter of legislative grace or executive clemency'").

For equal protection purposes, we note, and petitioner concedes, that neither prisoners nor indigents are a suspect class—like race, nationality, or alienage—under equal protection case law. *See Ortwein*, 410 U.S. at 660; *Hampton v. Hobbs*, 106 F.3d 1281, 1286 (6th Cir. 1997). There is also not a fundamental right implicated that would mandate strict scrutiny. While we recognize that all citizens have a constitutional right to access to courts, that right in and of itself is not a fundamental right for purposes of an equal protection analysis. *See Kras*, 409 U.S. at 446 (considering whether bankruptcy, not the right of access to courts, was a fundamental right implicating heightened scrutiny); *Ortwein*, 410 U.S. at 660 (analyzing whether welfare payment legislation, not the right of access to courts, implicated a fundamental right requiring heighted scrutiny). Furthermore, as discussed above, parole is not a fundamental right. *See Greenholtz*, 442 U.S. at 11. Therefore, we review petitioner's claims for rationality. *See M.L.B.*, 519 U.S. at 123-24 (stating that fee requirements are examined for rationality unless fitting into one of the two exceptions listed); *Kras*, 409 U.S. at 446 (utilizing rationality review for the equal protection analysis). Our court has stated:

> When applying the rational basis test, we have observed that state legislatures have the initial discretion to determine what is "different" and what is "the same" and that they are given considerable latitude in making those determinations. *See Robinson*, 29 S.W.3d at 480 (citing *Tenn. Small Sch. Sys.*, 851 S.W.2d at 153). Our inquiry into legislative choice usually is limited to whether the challenged classifications have a reasonable relationship to a legitimate state interest. *See id.* We have held that under the rational basis test, a statute may discriminate in favor of a certain class, as long as the discrimination is founded upon a reasonable distinction or difference in state policy. *See Castlewood, Inc. v. Anderson County*, 969 S.W.2d 908, 910 (Tenn. 1998).

*Gallaher*, 104 S.W.3d at 461.

Tennessee Code Annotated section 41-21-812 directly applies to indigent inmates who have outstanding fees from past litigation.[13]  Therefore, to satisfy rational basis review, we must conclude that singling out not only inmates but indigent inmates is reasonably related to a legitimate state interest.  After reviewing the legislative history, it is clear that the purpose of the statute is to offset the tide of frivolous inmate litigation filtering through the court system.  *Hearing on S.B. 2627 Before the Finance, Ways & Means Comm.*, 99th Gen. Assemb. (Tenn. 1996) (statement of Sen. Joe Haynes, Bill Sponsor, S. Comm. on Finance, Ways & Means).  In 1995, a year before this statute passed, inmates filed approximately 40,000 new lawsuits in federal court, which accounted for nearly a fifth of the federal civil docket.  Margo Schlanger, *Inmate Litigation*, 116 HARV. L. REV. 1555, 1557 (2003).  In 1995, the National Association of Attorneys General attempted to estimate the impact that inmate litigation had on state courts and, after surveying thirty-five states, estimated that states spent approximately eighty million dollars each year on inmate litigation.  *Id.* at 1625 (citing Letter from the National Association of Attorneys General to Senate Majority Leader Bob Dole (Sept. 19, 1995), *in* 141 Cong. Rec. S14, 413, S14, 417-18 (daily ed. Sept. 27, 1995)).  Because of these staggering numbers, in 1996, both the United States Congress and the Tennessee Legislature promulgated prison litigation reform statutes.  *See* 42 U.S.C. § 1997e (2013); Tenn. Code Ann. §§ 41-21-801 to -818.  Therefore, because inmate litigation is so prevalent, the State has a legitimate interest in reducing expenditures and offsetting the tide of frivolous inmate litigation.  Since the enactment of these statutes, the federal courts have seen a decrease in prisoner civil rights filings from 23.3 per 1000 prisoners in 1996 to 10.2 per 1000 prisoners in 2012.  Margo Schlanger, *Trends in Prisoner Litigation, as the PLRA Enters Adulthood*, 5 U.C. IRVINE L. REV. 153, 157 (2015).  Furthermore, when examining the prisoner filings in the U.S. District Courts in Tennessee, the prisoner filing rate decreased from 34.9 per 1000 prisoners in 1995 to 11.5 per 1000 prisoners in 2012.  *Id.* at 160.  Therefore, the narrowing of the statute from the general population of court litigants to only inmates is rationally related to a legitimate state interest.

Consideration of the rationality of narrowing Tennessee Code Annotated section 41-21-812 from inmates to indigent inmates requires an examination of how our court system operates to aid indigent persons' access to courts.  Tennessee Code Annotated section 20-12-127 enables residents of the state to file a poverty oath, which if later

---

[13] "Except as provided by subsection (b), on notice of assessment of any fees, taxes, costs and expenses under this part, a clerk of a court may not accept for filing another claim by the same inmate until prior fees, taxes, costs and other expenses are paid in full."  Tenn. Code Ann. § 41-21-812(a).  This section only applies to "a claim brought by an inmate in general sessions or a trial level court of record in which an affidavit of inability to pay costs is filed with the claim by the inmate."  Tenn. Code Ann. § 41-21-802.

approved by the court, allows a resident to commence a civil action without providing security for costs and without the payment of litigation taxes. Tenn. Code Ann. § 20-12-127(a). However, the statute also states that this exception "does not relieve the person filing the action from responsibility for the costs or taxes but suspends their collection until taxed by the court." *Id.* § 20-12-127(b). Therefore, persons who proceed in this manner are not required to provide funds at the beginning of a lawsuit to have their issue heard by the courts but, rather, are assessed fees at the end of a suit depending on the outcome. As such, indigent persons are more likely to file frivolous litigation because there is nothing to deter such filings, like fees and costs, at the beginning of a law suit. In addition, because of this procedural mechanism, indigent persons are more likely to have outstanding fees at the end of a lawsuit than a non-indigent person. Experts estimate that approximately eighty percent (80%) of inmates are indigent. Lauren-Brook Eisen, *Charging Inmates Perpetuates Mass Incarceration*, Brennan Center for Justice 1, 4 (2015), *available at* https://www.brennancenter.org/sites/default/files/blog/ Charging_Inmates_Mass_Incarceration.pdf; *Fines, Fees, and Bail: Payments in the Criminal Justice System that Disproportionately Impact the Poor*, Counsel of Economic Advisors Issue Brief 1, 5 (Dec. 2015). Tennessee Code Annotated section 41-21-807 governs an indigent inmate's payment of filing fees. While subsection (b)(1) states that an "inmate shall be required to pay the full amount of the filing fee," subsections (b)(1) and (2) also provide for partial payments of the fee *when funds exist* in the inmate's account. *See* Tenn. Code Ann. § 41-21-807(b)(1)-(2). However, if an indigent inmate fails to accrue money in their inmate account, the filing fee will remain unpaid. *See* Tenn. Code Ann. § 41-21-807(b)(1)-(4), (c). Therefore, narrowing the statute from the generality of prisoners to only indigent prisoners is rationally related to the state's interest in reducing expenditures and offsetting frivolous inmate litigation because, by operation of the system, indigent prisoners are more likely to have outstanding fees and they do not face the same financial deterrents at the beginning of litigation with which non-indigent prisoners contend.[14]

---

[14] In their dissents, Justice Lee and Justice Clark conclude that section 41-21-812 is inapplicable to petitioner because of the phrase "under this part." Justice Lee determines that for fees to be assessed "under this part," the underlying claim, here the divorce action, must be found to be frivolous before section 41-21-812 applies to the outstanding fees. While the statute certainly could have been worded more narrowly to apply only to indigent prisoners with unpaid costs from prior lawsuits that were deemed frivolous by a court, which would have more directly served the statute's purpose of reducing frivolous inmate litigation, we fail to see an express statutory directive to do so. We are not at liberty to disregard express statutory language or to second-guess policy choices made by the General Assembly. "This Court's constitutional function is to effectuate the intent of the General Assembly even when the result may appear unfair." *Bush v. State*, 428 S.W.3d 1, 21 (Tenn. 2014) (citing *Pickard v. Tenn. Water Quality Control Bd.*, 424 S.W.3d 511, 524 (Tenn. 2013)). Having determined that the statutory distinction is supported by a rational basis and does not violate equal protection and due process guarantees, our task is complete.

To further examine the rationality of Tennessee Code Annotated section 41-21-812, we examine the difference between indigent prisoners and other indigent litigants. This analysis requires us to consider how latent or outstanding fees are paid by indigent prisoners. The two most common ways are: (1) the inmate could voluntarily pay these fees or (2) the Tennessee Department of Correction could withdraw funds from an inmate trust account to pay a distress warrant issued by the clerk of the court to pay outstanding fees. *Fletcher v. State*, 9 S.W.3d 103, 105-06 (Tenn. 1999). Inmates can earn money for their trust accounts by accomplishing tasks within their correctional facility. While Tennessee Code Annotated sections 67-1-1201 and -1202 give a sheriff, deputy sheriff, or constable the ability to execute a distress warrant to collect property to satisfy an outstanding debt to the state, practically, an inmate will usually only have his or her trust account from which to satisfy the debt. However, other indigent litigants who are not incarcerated will often own other property with which to satisfy a distress warrant. Therefore, indigent inmates are distinct from other indigent litigants in their means and ability to pay outstanding fees.

Tennessee Code Annotated section 41-21-812 addresses those limited situations in which indigent inmates have been assessed fees in prior lawsuits and have yet to pay the fees voluntarily or through a deduction of their trust account, and it only applies until those fees are paid. The statute does not deprive the inmates of administrative remedies and does not permanently bar any inmate access to the courts. It assures that litigants will assess the merits and possible risks of litigation before filing suit. As the Executive Director of the Select Oversight Committee on Corrections stated:

> The garnishment of inmates' trust accounts to pay court costs . . . should be [a] strong deterrent[] to frivolous or malicious lawsuits, thereby reducing significant annual legal costs incurred by the state due to these suits.

---

Justice Lee and Justice Clark both conclude that section 41-21-812 is inapplicable to petitioner's case because in the divorce action, the clerk of the court failed to mail a copy of the court's judgment to the department of correction in accordance with Tennessee Code Annotated section 41-21-808(b). Justice Clark specifically states that for the fees to be assessed "under this part," *see* Tenn. Code Ann. § 41-21-812(a), the clerk must send the judgment to the department of correction, regardless of whether the judgment was sent to the petitioner himself. However, we conclude that section 41-21-808(b) is an enforcement statute regarding the collection of fees, not a statute that reflects the process for assessing fees to a prisoner or the procedure for providing notice to a petitioner. *See* Tenn. Code Ann. § 41-21-812(a) ("[O]n notice of assessment of any fees, taxes, costs and expenses under this part, a clerk of a court may not accept for filing another claim by the same inmate until prior fees, taxes, costs and other expenses are paid in full."). Therefore, we conclude that limiting application of section 41-21-812(a) to whether the clerk of the court took appropriate action pursuant to section 41-21-808(b) would be incongruous with the Act as a whole.

*Hearing on S.B. 2627 Before the Select Oversight Comm. on Corr.*, 99th Gen. Assemb. (Tenn. 1996) (statement of Claire Drowota, Exec. Dir., Select Oversight Comm. on Corr.). While we fully support indigent inmates in filing necessary claims, there must be some meaningful consequence for the failure to pay outstanding fees, which, by operation of the system, indigent inmates are considerably more likely to have. We cannot allow the assessment of costs to become an empty exercise. Courts need an available recourse when a party refuses to comply with a valid order for the payment of costs to prevent such a litigant from accruing more costs by filing meritless litigation.

Therefore, we conclude that Tennessee Code Annotated section 41-21-812 passes rational basis review. The Tennessee court system incurs operating costs when enabling indigent inmate litigation. The state has a legitimate interest in reducing these costs and in reducing the amount of meritless inmate litigation. Based on the above discussion, section 41-21-812 is rationally related to the state's interest. The constitutional requirement of rationality is satisfied, and Tennessee Code Annotated section 41-21-812 does not offend principles of equal protection.

Furthermore, to specifically address the due process concerns involved, in *Kras*, the court "stressed the existence of alternatives, not conditioned on the payment of the fees, to the judicial remedy." *Ortwein*, 410 U.S. at 659 (citing *Kras*, 409 U.S. at 446). In this case, petitioner had a hearing before the Tennessee Board of Probation and Parole that was not contingent upon his ability to pay any filing fees and also had the ability to appeal the board's decision within their internal system. He took advantage of the board's appellate process, and his appeal was denied by letter because the board stated, "Upon reviewing the board file and audio recording of the hearing, your allegations of misconduct and significant procedural error(s) by the Hearings Official were not substantiated." Therefore, under the facts of this case, petitioner was not denied due process.

## B. Tennessee Open Courts Clause

Petitioner also claims that he is entitled to relief under the Open Courts Clause of the Tennessee Constitution. However, petitioner failed to raise this issue in his pro se application for permission to appeal.

> Appellants and parties seeking relief under Tenn. R. App. P. 11 must include in their application for permission to appeal and in their brief a statement of the issues they desire to present to the court and an argument with respect to each of the issues presented. The issues should be framed as specifically as the nature of the error will permit in order to avoid any potential risk of waiver.

*Hodge v. Craig*, 382 S.W.3d 325, 334-35 (Tenn. 2012). We also note that petitioner only fully asserts and briefs this claim in his reply brief. Issues raised for the first time in a reply brief are waived. *See State v. Banks*, No. W2014-02195-CCA-R3-CD, 2016 WL 369562, at *10 (Tenn. Crim. App. Jan. 29, 2016) (citations omitted); *State v. Fitzpatrick*, E2014-01864-CCA-R3-CD, 2015 WL 5242915, at *8 (Tenn. Crim. App. Sept. 8, 2015). Therefore, petitioner's argument regarding the Open Courts Clause is waived.

## CONCLUSION

In summary, we conclude that the State sufficiently complied with the procedural requirements of Tennessee Code Annotated section 41-21-812 and that as applied in this case, section 41-21-812 does not violate the Due Process or Equal Protection provisions of the United States Constitution or the Tennessee Constitution. We also conclude that petitioner has waived his challenge pursuant to the Open Courts Clause of the Tennessee Constitution. Accordingly, we affirm the decisions of the Tennessee Court of Appeals and Davidson County Chancery Court and dismiss petitioner's appeal pursuant to Tennessee Code Annotated section 41-21-812. The costs of this cause shall be paid by Reginald Dion Hughes, for which execution may issue if necessary.

_____
ROGER A. PAGE, JUSTICE