IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
March 29, 2022 Session

**JOHN DOE 1, ET AL. V. WOODLAND PRESBYTERIAN, ET AL.**

**Appeal from the Circuit Court for Shelby County
No. CT-1980-20     Rhynette N. Hurd, Judge**

---

**No. W2021-00353-COA-R3-CV**

---

This appeal arises from a lawsuit alleging that a number of Presbyterian church entities were negligent regarding the sexual abuse of minors by a Presbyterian clergyman.  John Doe 1, John Doe 2, and John Doe 3 ("Plaintiffs")[1], members and/or attendees of Woodland Presbyterian Church ("Woodland") in the 1990s, sued former pastor James B. Stanford ("Stanford") and a host of Presbyterian institutional defendants for negligence in the Circuit Court for Shelby County ("the Trial Court").[2]  The institutional defendants filed motions to dismiss, which were granted by the Trial Court.  Plaintiffs appeal arguing, among other things, that the statute of limitations was tolled due to fraudulent concealment.  They argue further that the Trial Court erred in dismissing their claim of negligent infliction of emotional distress stemming from certain of the institutional defendants allegedly releasing Plaintiffs' names to the media in 2019.  We affirm the Trial Court's dismissal of Presbyterian Church (U.S.A.), A Corporation and Evangelical Presbyterian Church for lack of personal jurisdiction.  However, we hold further, *inter alia*, that in view of the Tennessee Supreme Court's holding in *Redwing v. Catholic Bishop for the Diocese of Memphis*, 363 S.W.3d 436 (Tenn. 2012), the Trial Court erred in dismissing Plaintiffs' complaint at the motion to dismiss stage based upon the statute of limitations when Plaintiffs alleged that efforts were made by certain of the institutional defendants to hide the sexual abuse and a "whitewash" ensued.  As Plaintiffs successfully alleged fraudulent concealment, we reverse the Trial Court with respect to the statute of limitations issue.  We also reverse the

---

[1] Plaintiffs are proceeding in this lawsuit under pseudonyms.

[2] The institutional defendants sued were Presbyterian Church (U.S.A.), A Corporation; Woodland Presbyterian Church; The Presbytery of the Midsouth, Inc.; Synod of Living Waters Presbyterian Church (U.S.A.), Inc.; Evangelical Presbyterian Church; Presbytery of the Central South, Inc.; and Presbytery of Sheppards and Lapsley.  The dismissal of Presbytery of Sheppards and Lapsley is not being pursued by Plaintiffs on appeal.  We refer to the remaining entities as "the institutional defendants" herein.  However, when certain claims or issues pertain to less than all of these entities, we specify the entity or entities in question as necessary.

Trial Court's dismissal of Plaintiffs' negligent infliction of emotional distress claim against Woodland and Presbytery of the Central South, Inc. We, therefore, affirm in part and reverse in part the judgment of the Trial Court, and remand for further proceedings consistent with this Opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed, in Part, and Reversed, in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and CARMA DENNIS MCGEE, J., joined.

Gary K. Smith, Karen M. Campbell, and Jeffrey S. Rosenblum, Memphis, Tennessee, for the appellants, John Doe 1, John Doe 2, and John Doe 3.

Jeremy S. Rogers, Louisville, Kentucky, and Molly Glover and Lani D. Lester, Memphis, Tennessee, for the appellee, Presbyterian Church (U.S.A.), A Corporation.

Christopher L. Ehresman, Des Moines, Iowa, for the appellee, Woodland Presbyterian Church.

Jill M. Steinberg and Shayna A. Giles, Memphis, Tennessee, for the appellee, The Presbytery of the Mid-South, Inc.

William R. Johnson, Brentwood, Tennessee, for the appellee, Synod of Living Waters Presbyterian Church (U.S.A.), Inc.

Richard D. Underwood, Memphis, Tennessee, for the appellees, Evangelical Presbyterian Church and Presbytery of the Central South, Inc.[3]

Kimberly M. Ingram, Nashville, Tennessee, for the appellee, Presbytery of Sheppards and Lapsley.[4]

James B. Stanford, Pro Se appellee.[5]

---

[3] Although these parties are represented by the same attorney, they have filed separate briefs on appeal.

[4] Presbytery of Sheppards and Lapsley, an Alabama corporation headquartered in Alabama, elected to not file a brief on appeal. In their complaint, Plaintiffs alleged: "By 2019 Pastor James Stanford was an associate pastor at First Presbyterian Church in Birmingham, Alabama, a member of Presbyterian Church (U.S.A.) under the governance of the Defendant Presbytery of Sheppards and Lapsley who had responsibility to investigate Stanford when the allegations were made." Plaintiffs do not appeal the dismissal of Presbytery of Sheppards and Lapsley, and we leave its dismissal undisturbed herein.

[5] Stanford filed no brief on appeal. This appeal concerns the dismissal of the institutional defendants.

# OPINION

## Background

In May 2020, Plaintiffs filed suit in the Trial Court against Stanford and a host of Presbyterian institutional defendants. As this case was disposed of as to the institutional defendants at the motion to dismiss stage, we deem it appropriate to set out the allegations of Plaintiffs' complaint in some detail. Plaintiffs alleged, in part, as follows: that, in the mid-1990s, Plaintiffs and their families were either members or regular attenders of Woodland where Stanford was the lead pastor; that Stanford would invite Plaintiffs over to his church-provided house called "the manse" to spend the night; that Stanford sexually abused Plaintiffs on these visits; that Woodland allowed Stanford "unfettered access" to minors; and that "the Church leaders knew that Stanford was inviting young boys to spend the night at his house from the very start of this inappropriate conduct and even before any overt acts of sexual abuse had occurred, and they did nothing to stop him from continuing this practice." Plaintiffs stated further:

> Woodland Presbyterian Church, including its Session, and other Defendants, Presbytery of the Mid-South, Synod of Living Waters, Presbyterian Church (U.S.A.), the Presbyterian Church (U.S.A.), Presbytery of the Central South, Inc., and Evangelical Presbyterian Church, failed to have policies in place that would prevent Pastor Stanford from being alone with minors on church-owned property, and Defendants failed to have training for its employees and staff to identify suspicious behavior and report it to prevent abuse from occurring. Finally, when these allegations came to light again in June of 2019, Woodland Presbyterian Church, under the leadership of Defendants Presbytery of the Central South, Inc. and the Evangelical Presbyterian Church, failed to acknowledge the truthful allegations of abuse, failed to protect the identity of the young men who had the courage to assert the allegations, and otherwise failed to take the heinous allegations asserted by John Doe 1, John Doe 2, and John Doe 3 seriously.

Additionally, Plaintiffs alleged that the Presbyterian Church and its subdivisions did little or nothing to train employees and agents to look for abusers; that in the early 1990s, the Presbyterian Church conducted a study on sexual abuse by clergymen which found the Church at all levels lacking in policies and procedures to deal with sexual abuse by clergymen; that Plaintiffs reported their abuse to a Woodland Sunday school teacher at the time but they were simply made to confront Stanford, who denied the abuse; and that Plaintiffs have experienced harm, pain, suffering, and anxiety that they otherwise would

not have but for Woodland; its Session;[6] The Presbytery of the Mid-South, Inc.; Synod of Living Waters Presbyterian Church (U.S.A.), Inc.; Presbyterian Church (U.S.A.), A Corporation; their employees and agents; and Stanford, himself.

Plaintiffs alleged further that in June 2019, John Doe 3 contacted Pastor Matt Miller at Woodland about the abuse Plaintiffs suffered; that John Doe 3 was told Miller believed him because he had heard stories supporting Plaintiffs' claims; that in August 2019, former Woodland Pastor John Sowers told John Doe 1 that the situation surrounding Stanford had been "fully investigated" at the time; however, that no one had been interviewed as part of the investigation except Stanford and he was only asked about one isolated incident with one victim; that when John Doe 1 contacted John Sowers in early 2020 seeking more information, Sowers said he needed to "pray about it" and asked for the "gift of time"; and that Plaintiffs thereafter never heard from Sowers again. With regard to their specific allegations as to the institutional defendants' breaches of duty, Plaintiffs asserted:

> Defendants Woodland Presbyterian Church including its Session, the Presbytery of the Mid-South, Synod of Living Waters, Presbyterian Church (U.S.A.), their employees and agents, including James Stanford were in a fiduciary relationship with John Doe 1, John Doe 2, and John Doe 3. The Defendants were in a position of trust and confidence with John Doe 1, John Doe 2, and John Doe 3. John Doe 1, John Doe 2, and John Doe 3 looked to Woodland Presbyterian Church, including its Session, the Presbytery of the Mid-South, Synod of Living Waters, Presbyterian Church (U.S.A.), and their employees and agents, including Stanford, for guidance, education, instruction, and spiritual growth as a person. In addition, the Defendants knew or should have known that Stanford had misused his position and groomed John Doe 1, John Doe 2, and John Doe 3 for an inappropriate, physical and/or sexual relationship. Woodland Presbyterian Church, including its Session, the Presbytery of the Mid-South, Synod of Living Waters, Presbyterian Church (U.S.A.), and their employees and agents had a duty to John Doe 1, John Doe 2, and John Doe 3 and breached the duty to:
> (a) Investigate, warn, and protect John Doe 1, John Doe 2, and John Doe 3 from the potential for harm from Pastor James Stanford;
> (b) Disclose its awareness of facts regarding Pastor James Stanford that created a likely potential for harm;
> (c) Properly screen and vet its prospective employees, employees, agents and volunteers, including Pastor James Stanford before placing them in a position where they could misuse their position to harm others;

---

[6] "The Session" refers to Woodland's local governing board.

-4-

(d) Properly supervise its agents, employees and volunteers including Pastor Stanford to prevent harm to its minor members of the church and other minors such as John Doe 1, John Doe 2, and John Doe 3;

(e) Properly train employees, agents, staff and volunteers to watch for potential risks of harm such as those posed by the conduct of James Stanford;

(f) Implement policies for employees, agents, staff, and volunteers to address and report suspected abusers and potential risks of harm;

(g) Provide adequate security on the premises to prevent unauthorized use of the church facilities;

(h) Allow for the creation and maintenance of an environment that was free from abuse and behavior that encouraged and fostered abuse;

(i) Conduct meaningful and thorough investigations when receiving warnings about those employees working with and who have access to youth;

(j) Conduct meaningful and thorough investigations when receiving information about past abuse and ensure that they are conducted;

(k) Provide a safe environment for minors such as John Doe 1, John Doe 2, and John Doe 3 where they would be free from abuse;

(l) Protect John Doe 1, John Doe 2, and John Doe 3 from exposure to harmful individuals like James Stanford; and

(m) Implement policies for supervising pastors, volunteers, employees and agents to prevent occurrences and harm such as what occurred with John Doe 1, John Doe 2, and John Doe 3.

Plaintiffs asserted claims of negligence in hiring, supervision, retention and training; negligence *per se* for failing to report suspicion of child abuse in contravention of Tenn. Code Ann. § 37-1-403 and Tenn. Code Ann. § 37-1-605; negligent infliction of emotional distress; and failure to investigate, as well as that Plaintiffs were entitled to punitive damages. Plaintiffs asserted that "[t]he Defendants, Woodland Presbyterian Church, including its Session, the Presbytery of the Mid-South, Presbytery of Sheppards and Lapsley, Synod of Living Waters, and Presbyterian Church (U.S.A.), are liable for their own negligence, as well as the negligence of all other Defendants by virtue of the doctrines of agency, apparent agency, employer-employee relations, master servant, *respondeat superior*, joint venture, contract, and/or vicarious liability." In addition, Plaintiffs asserted that defendants Presbytery of the Central South, Inc. and Evangelical Presbyterian Church are liable as successors to The Presbytery of the Mid-South, Inc., Synod of Living Waters Presbyterian Church (U.S.A.), Inc., and Presbyterian Church (U.S.A.), A Corporation, after Woodland voted to leave the Presbyterian Church (U.S.A.) and join Presbytery of the Central South, Inc. and Evangelical Presbyterian Church. Elsewhere in their complaint, Plaintiffs stated that after they spoke with church officials in 2019, "Woodland

Presbyterian Church and/or members of the Session and/or one of the other Defendants revealed their identities as sexual abuse victims to the news media causing further anxiety, pain, and suffering."

According to Plaintiffs, the statute of limitations was tolled because "[i]n the summer of 2019, the Plaintiffs were told by former Woodland Presbyterian pastor John Sowers that a 'full investigation' was done at the time the complaints were made in the 1990s"; yet, "[t]he Plaintiffs recently learned that the 'full investigation' was a complete 'whitewash'"; that "[u]pon information and belief efforts were undertaken to conceal and hide this illegal and heinous activity"; and that "Woodland Presbyterian Church, including its Session, the Presbytery of the Mid-South, Synod of Living Waters, Presbyterian Church (U.S.A.), and their agents and employees were aware of the risks of clergy abuse in the Presbyterian Church in the early 1990s prior to their abuse but failed to implement policies that would protect its own members, including them."

The institutional defendants filed motions to stay discovery so they could pursue motions to dismiss. Stanford did not file either an answer or a motion to dismiss. In October 2020, the Trial Court entered an order granting motions to dismiss filed by Woodland, The Presbytery of the Mid-South, Inc. and Synod of Living Waters Presbyterian Church (U.S.A.), Inc. The Trial Court held that Plaintiffs failed to state a cause of action and that the applicable one-year statute of limitations had expired. At an October 2, 2020 hearing, the Trial Court stated, in part:

> [THE COURT:] … Okay. So, for the claims that are asserted here, there's a -- in this Court's view, a one-year statute of limitations applies to these claims. The three-year statute of limitations, as many of you have stated in your briefs, would not apply in this case. We do have minors at the time of the incident, but -- and they would have had at least a year from the time that they turned 18 to -- to pursue their claims.
> Now, I'm talking about the claims related to directly the incidents from the 1990s, okay? We're going to leave 2019 out right now, okay?
> So there is a statute of limitations of one year that's applied. These plaintiffs are now in their 30s, and The Court finds that the statute of limitations has run on their claims.
> They knew what happened then. In fact, they reported what happened then. They knew what investigation was or was not done then. So, once they turned 18, within a year they should have asserted those claims.

There's nothing new that they learned anytime later about what happened to them that would have tolled the statute of limitations. There was nothing else for them to discover.

Now, the -- it appears to The Court that they were aware of the injuries, the identity of the person who's responsible, the identity of the employer of the perpetrator. In fact, these claims were actually reported to the entity.

Now, although the plaintiffs include, in their Complaint, allegations concerning tolling of the statute under theories such as equitable estoppel and fraudulent concealment, The Court finds these theories inapplicable.

The plaintiffs do not allege that the defendants took any steps to prevent the plaintiffs from discovering the injury or discovering the cause or source of the injury. In fact, the Complaint clearly states that the plaintiffs knew and reported their injury. They reported who injured them. They reported the circumstances of the injury.

So they're -- in fact, on the face of the Complaint, it is apparent, it's clear that there was not any fraudulent concealment, and, therefore, that type of tolling, including equitable estoppel, a tolling principle, would not apply here.

In fact, the plaintiffs actually knew the extent of the investigation back in the 1990s. In The Court's view, then the statute of limitations has expired on that -- those claims.

It was also within the plaintiffs' capacity, and nothing was being hidden from the plaintiffs, to discover the various relationships among the various defendants. That was not a secret. It was available to anyone who wanted to see it. It's public record what the relationship was.

So that would not be a basis for the plaintiffs to assert now that it did not know who to sue or who to -- who may have been responsible or the theory for that responsibility for the injuries that they are alleging.

There's no new information today that was not available to the plaintiffs years ago, and neither defendant failed to disclose any information that would allow the plaintiffs to -- to know who they were to sue back -- I keep saying the '90s, but, obviously, it would be after they turned 18, but based on the claims of the events that happened in the 1990s.

Now, there is a claim sort of -- in Paragraph 47, the plaintiffs allege that -- in 2019, that Woodland Presbyterian and one of the other defendants revealed their identities as sexual abuse victims to the news media further causing anxiety, pain, suffering, et cetera.

But the plaintiffs have not asserted, have not alleged, have not pled any facts to support a claim for libel, slander, defamation or any kind of cause of action like that. So the Complaint fails to state a claim for libel, slander, defamation because of the release of names to the media.

So, even construing the Complaint in the light most favorable to the plaintiff, the plaintiffs have failed to state a claim upon which relief could be granted.

I understand a theory that the plaintiffs were asserting that in 2019, having spoken to someone else about this, that they were reminded of it or it caused them pain to think about it, but if -- if that was allowable under the law, then the statute of limitations would have no meaning whatsoever because if victims like these -- and what happened to them is horrible. There is no doubt about that. It happens all too often.

And one reason I wanted to take this and look at the Complaint, that's all I can look at, as thoroughly as I possibly could, because if there were any way I could find that there was something stated within all of these allegations that, you know, there might be some relief for these -- for these plaintiffs, but I found none.

So if every time someone thought about or talked to someone about something that happened to them that was terrible that that was the beginning of the running of a new statute of limitations, no claims would ever rest. No claims. No defendants would ever be free of the possibility of being sued.

So, all in all, The Court is granting the motions to dismiss for each of these defendants and, for the Defendant Presbytery of Sheppards and Lapsley, also on the basis of the lack of personal jurisdiction.

In December 2020, the Trial Court granted Presbyterian Church (U.S.A.), A Corporation's motion to dismiss. The Trial Court held that Plaintiffs failed to show that the court had either specific or general jurisdiction over Presbyterian Church (U.S.A.), A Corporation. The Trial Court stated further that Plaintiffs' claims were subject to the one-year statute of limitations found at Tenn. Code Ann. § 28-3-104. In January 2021, the Trial Court granted motions to dismiss filed by Evangelical Presbyterian Church and Presbytery of the Central South, Inc. The Trial Court attached to its order of dismissal a transcript of its December 11, 2020 ruling, which stated in part:

[THE COURT:] … So there are no allegations that the Court can find that would establish general or specific jurisdiction for Evangelical Presbyterian Church.

Paragraph 8 says that -- I'll just call it EPC is a Michigan corporation and that its principal place of business is Florida.

-8-

No. 12 says that Evangelical Presbyterian Church failed to acknowledge truthfulness of allegations, failed to protect identity, failed to take allegations seriously, and the other allegations in that paragraph do not apply or could not apply to Evangelical Presbyterian Church because they were allegations that assert failures prior to 2011, which is the time that Woodland Presbyterian became part of Evangelical Presbyterian Church. So so far there's nothing that suggests the specific jurisdiction that's related to this particular case.

No. 14 says the causes of action arise as a result of negligence of defendants. So that's all of the defendants, I suppose, including Evangelical Presbyterian Church; but that's not a factual allegation, that's a legal conclusion.

No. 17, plaintiffs allege Woodland is part of Evangelical Presbyterian Church. And interestingly in that paragraph they also allege that Woodland was in exclusive control -- now, I'm to accept all of this as true -- exclusive control of its facilities and employees and agents. So therefore, Evangelical Presbyterian Church nor the Presbytery of Central South had control of the employees and agents.

Remember I'm to accept all of these as true. Now, I'm to construe them in the light most favorable to the plaintiff, but I'm to accept them as true.

Then 18, Woodland joined EPC and Presbytery of Central South in 2011. That tells us what Woodland does. It doesn't tell us anything about what the other defendants did.

47, that Woodland Presbyterian and its Session revealed the identities to two media -- to the news media, causing anxiety and pain. It didn't say that EPS [sic] did that.

In other words, as I go through the complaint, I find nothing that supports general or specific jurisdiction for that. So I find I do not have jurisdiction for those entities.

Now, in terms of that there's no purposeful activity by Evangelical Presbyterian Church, so there's insufficient context for the Court to hale them into Tennessee for these.

So the next question was whether the Court should reconsider its determination that the complaint should be dismissed considering the allegations related to the disclosure of the identities of these plaintiffs to the news media. And I have exhausted my research skills, and I absolutely can find nothing where Tennessee recognizes a cause of action for disclosing. It may be terrible that they did that, but Tennessee simply does not recognize a cause of action for disclosing the names of sexual abuse victims.

-9-

Plaintiffs filed a motion pursuant to Tenn. R. Civ. P. 60.02 arguing that the Trial Court misinterpreted their claim for negligent infliction of emotional distress as being one for defamation. The Trial Court denied this motion.

In December 2020, Plaintiffs filed a motion for default judgment against Stanford. For their part, certain of the institutional defendants filed motions pursuant to Tenn. R. Civ. P. 54.02 seeking to certify as final the orders dismissing them. In January 2021, a hearing was held on Plaintiffs' motion for default judgment against Stanford, at which time Stanford told the Trial Court he was "ready for the judgment." However, the institutional defendants objected to entry of default judgment against Stanford. The Trial Court postponed ruling for a week. At the subsequent hearing, the Trial Court ruled that it would hold Plaintiffs' motion for default judgment as well as the request to set writ of inquiry in abeyance while Plaintiffs appealed the dismissal of the institutional defendants.

Plaintiffs then filed a motion pursuant to Tenn. R. Civ. P. 27.02 to depose Stanford while the rest of the case was appealed.[7] Plaintiffs cited Stanford's age and health. In March 2021, the Trial Court denied Plaintiffs' motion. In its oral ruling, of which a transcript was attached to its order, the Trial Court explained:

> Let me say at the start that when the Court ruled to stay discovery, the whole idea of staying discovery, this is what I thought of as -- as the issue came before me, is particularly with Statute of Limitations and personal jurisdiction, that if, in fact, the Court found that those were valid, then taking discovery is really a waste of time, money, energy, et cetera, and that it should be stayed until the Court ruled on those motions, with the thought being that if the Court found that those were not valid defenses, then you could go forward right away with the discovery and actually only if that part of the case. Otherwise there is no point in staying at all, right, I mean, if you can go forward.

---

[7] Tenn. R. Civ. P. 27.02 provides:

> If an appeal has been taken from a judgment or before the taking of an appeal of the time therefor has not expired, the court in which the judgment was rendered may allow the taking of the depositions of witnesses to perpetuate their testimony for use in the event of further proceedings in the trial court. In such case the party who desires to perpetuate the testimony may make a motion in the trial court for leave to take depositions, upon the same notice and service thereof as if the action was pending in that court. The motion shall show (1) the names and addresses of persons to be examined and the substance of the testimony which the party expects to elicit from each; (2) the reasons for perpetuating their testimony. If the court finds that the perpetuation of the testimony is proper to avoid a failure or delay of justice, it may make an order allowing the depositions to be taken and may make orders of the character provided for by Rules 34 and 35, and thereupon the depositions may be taken and used in the same manner and under the same conditions as are prescribed in these rules for depositions taken in actions pending in the trial court.

Consider that Mr. Stanford was not in the case. I doubt seriously there would be a question about going forward with the -- any discovery of Mr. Stanford or anyone else, if he were not a defendant in the case but simply was someone you wanted to depose.

It appears to me that the only -- the only reason to depose Mr. Stanford now seeing as he has admitted liability, even though that's not properly before the Court, there is nothing from him that does that -- or, responsibility. I should put it that way. The only reason would be, one, for damages, you know, any information about Mr. Stanford's ability to pay damages and to see what Mr. Stanford might be able to say about the other defendants, which would be counter to the Court's having granted the stay in the first place.

I understand 27.02. I think that it is appropriate in this case to not allow this deposition to go forward. I agree with the defendants that -- and the first thing I thought about when I saw Mr. Stanford's age was that he's lucky, like I am, that I just finished my second dose, that he is eligible; and so he may be more protected than anyone else on this call besides me because of his age.

So the COVID is not an issue. I thought also about the original filing for the deposition where there was reference to another condition, but there was nothing in the record to support that Mr. Stanford would be suffering from that condition.

So I'm denying the motion to go forward with the depositions for Mr. Stanford as I see it really does pose a difficult situation, not for necessarily -- well, I should say not only for the defendants, but for the Court as to how to distinguish defendants who were dismissed on personal jurisdiction, which places them -- there are handcuffs on them as to what they can do.

But if they weren't there, certainly that would be extreme prejudice to them; and I -- it appears to me that the whole purpose for having granted the stay was to avoid -- avoid defendants who -- against whom there really were no claims because of either Statute of Limitations or personal jurisdiction, avoid their having to prepare for and engage in activities for a deposition of any party, particularly in light of the fact that they have not even had any interaction with the plaintiffs in this case.

So I'm denying the motion….

The Trial Court also declined Plaintiffs' request to question Stanford about his health at the hearing. In March 2021, the Trial Court entered an order certifying as final its orders dismissing the institutional defendants. The order was defective because the certificate of service was incomplete. The order was re-issued in April 2021 with a completed certificate of service.

In March 2021, Plaintiffs filed a motion to temporarily lift the stay of discovery in order to file discovery responses they had received from Stanford. The Trial Court denied this motion in an April 2021 order, stating that it no longer had subject matter jurisdiction because Plaintiffs appealed the dismissal of the institutional defendants. In its oral ruling, of which a transcript was attached to its order, the Trial Court stated in part: "So in this Court's view even though we have a number of defendants and all defendants except Mr. Stanford the Court has ruled on a motion to dismiss or to dispose of those claims, the Court is not inclined here to rule on any other issue until after the case is finished on appeal." Plaintiffs sought an extraordinary appeal under Tenn. R. App. P. 10 regarding having been denied a Tenn. R. Civ. P. 27.02 deposition of Stanford, which this Court denied. Plaintiffs timely appealed to this Court as of right.

**Discussion**

Plaintiffs raise seven issues on appeal. Discerning that certain of these issues overlap, we restate, consolidate, and re-order Plaintiffs' issues as follows: 1) whether the Trial Court erred in dismissing Plaintiffs' claims against Presbyterian Church U.S.A., A Corporation and Evangelical Presbyterian Church for lack of personal jurisdiction; 2) whether the Trial Court erred in dismissing Plaintiffs' claims against Woodland; The Presbytery of the Mid-South, Inc; Synod of Living Waters Presbyterian Church (U.S.A.), Inc; and Presbyterian Church (U.S.A.), A Corporation, on grounds that the statute of limitations expired and that no tolling provisions applied to prevent the running of the statute of limitations; 3) whether the Trial Court erred in dismissing Plaintiffs' negligent infliction of emotional distress claim from 2019 against Woodland; Presbytery of the Central South, Inc. and Evangelical Presbyterian Church; and 4) whether the Trial Court abused its discretion, both in denying Plaintiffs discovery and in declining to enter default judgment against Stanford.

We first address whether the Trial Court erred in dismissing Plaintiffs' claims against Presbyterian Church (U.S.A.), A Corporation and Evangelical Presbyterian Church for lack of personal jurisdiction. Regarding our standard of review for motions to dismiss based upon a lack of personal jurisdiction, the Tennessee Supreme Court has explained:

> A defendant may challenge the existence of personal jurisdiction by filing a motion to dismiss the complaint under Rule 12.02(2) of the Tennessee Rules of Civil Procedure. The defendant may choose to support the motion with affidavits or other evidentiary materials. If a defendant does so, the plaintiff must respond with its own affidavits or other evidentiary materials. *First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 382 (Tenn. 2015); *Gordon* [*v. Greenview Hosp., Inc.*], 300 S.W.3d [635] at 644 [(Tenn. 2009)]. However, a Rule 12.02(2) motion is not converted to

one for summary judgment when the parties submit matters outside the pleadings. *State v. NV Sumatra Tobacco Trading Co.*, 403 S.W.3d 726, 739 (Tenn. 2013); *Gordon*, 300 S.W.3d at 644.

The plaintiff bears the burden—albeit not a heavy one—of establishing that the trial court may properly exercise personal jurisdiction over a defendant. *First Cmty. Bank*, 489 S.W.3d at 382; *Gordon*, 300 S.W.3d at 643. When a defendant supports its Rule 12.02(2) motion with affidavits or other evidentiary materials, the burden is on the plaintiff to make a prima facie showing of personal jurisdiction over the defendant through its complaint and affidavits or other evidentiary materials. To make a prima facie showing of personal jurisdiction under Tennessee law, the factual allegations in the plaintiff's complaint, affidavits, and other evidentiary materials must establish sufficient contacts between the defendant and Tennessee with reasonable particularity. *First Cmty. Bank*, 489 S.W.3d at 383.

In evaluating whether the plaintiff has made a prima facie showing, the trial court must accept as true the allegations in the plaintiff's complaint and supporting papers and must resolve all factual disputes in the plaintiff's favor. *Sumatra*, 403 S.W.3d at 739. However, the court is not obligated to accept as true allegations that are controverted by more reliable evidence and plainly lack credibility, conclusory allegations, or farfetched inferences. *First Cmty. Bank*, 489 S.W.3d at 382. Nevertheless, the court should proceed carefully and cautiously to avoid improperly depriving the plaintiff of its right to have its claim adjudicated on the merits. *Gordon*, 300 S.W.3d at 644.

A trial court's decision regarding the validity of personal jurisdiction over a defendant presents a question of law. We therefore conduct a de novo review of the trial court's decision with no presumption of correctness. *First Cmty. Bank*, 489 S.W.3d at 382; *Gordon*, 300 S.W.3d at 645. In other words, in this appeal, we conduct the same evaluation of [the] complaint and the parties' affidavits and supporting papers relating to [the] Rule 12.02(2) motion as the trial court.

*Crouch Ry. Consulting, LLC v. LS Energy Fabrication, LLC*, 610 S.W.3d 460, 470-71 (Tenn. 2020). Elaborating upon the legal basis for Tennessee courts' exercise of personal jurisdiction, and the jurisprudence undergirding same, the *Crouch* Court discussed as follows:

-13-

The authority of a Tennessee court to exercise personal jurisdiction over a nonresident defendant is first defined by statute. *See generally Sumatra*, 403 S.W.3d at 740-41 (discussing the history of Tennessee's long-arm statutes); *Gordon*, 300 S.W.3d at 645-46 (same). Tennessee law provides, in part, that a nonresident is subject to the jurisdiction of a Tennessee court not only as to any action or claim for relief that arose from "[e]ntering into a contract for services to be rendered ... in this state," but also on "[a]ny basis not inconsistent with the constitution of this state or of the United States." Tenn. Code Ann. § 20-2-214(a)(5), (6) (2009); *see also* Tenn. Code Ann. § 20-2-225(2) (2009). We have recognized that Tennessee's long-arm statutes expand the jurisdictional reach of Tennessee courts "as far as constitutionally permissible."[8] *First Cmty. Bank*, 489 S.W.3d at 384 (quoting *Sumatra*, 403 S.W.3d at 740). The constitutional limits of that jurisdiction are "set by the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Sumatra*, 403 S.W.3d at 741. As we analyze those limits, we observe that although the decisions of the federal circuit and district courts—and even those of our sister states—can be instructive as we interpret the application of the Fourteenth Amendment in the context of this case, we are bound only by the decisions of the United States Supreme Court. *See Hughes v. Tenn. Bd. of Prob. & Parole*, 514 S.W.3d 707, 713 n.8 (Tenn. 2017); *State v. Carruthers*, 35 S.W.3d 516, 561 n.45 (Tenn. 2000).

The principle that the Due Process Clause of the Fourteenth Amendment limits the authority of state courts to enter binding judgments against nonresident defendants dates back to the nineteenth century. *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 222, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) (identifying due process limits announced in *Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565 (1877)). The United States Supreme Court first articulated the modern approach for analyzing due process limitations on personal jurisdiction in the transformative case of *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The Court eschewed the historical view that a defendant's presence within the territorial jurisdiction of a court is a prerequisite to the court's authority to render a valid judgment. *Id.* at 316, 66 S.Ct. 154 (citing *Pennoyer*, 95 U.S. at 733). In its place, the Court crafted a new view:

---

[8] Because Tennessee's long-arm statutes reach as far as constitutionally permissible, the question of how the allegations in the plaintiff's complaint fit within the long-arm statutes is effectively subsumed in the question of whether it is constitutionally permissible for a Tennessee court to exercise jurisdiction over the nonresident defendant.

> [D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

*Id*. (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). *International Shoe*'s "minimum contacts" paradigm has been the touchstone of personal jurisdiction for seventy-five years.

> From the very beginning, the Court stated that the analysis "cannot be simply mechanical or quantitative." *Id*. at 319, 66 S.Ct. 154. Instead, "[w]hether due process is satisfied must depend rather upon the quality and nature" of the defendant's activities. *Id*. Thus, in the wake of *International Shoe*, the relationship among the defendant, the forum, and the litigation became the central concern of the inquiry into personal jurisdiction. *Daimler AG v. Bauman*, 571 U.S. 117, 126, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014).[9]

*Crouch*, 610 S.W.3d at 471-72 (footnotes in original but renumbered). The Tennessee Supreme Court elucidated further:

> Determining whether a forum state may exercise specific personal jurisdiction over a nonresident defendant is a two-step analysis which requires a court to analyze first whether the defendant's activities in the state that gave rise to the cause of action constitute sufficient minimum contacts with the forum state to support specific jurisdiction and, if so, whether the exercise of jurisdiction over the nonresident defendant is fair.

*Crouch*, 610 S.W.3d at 473 (quoting *First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 388 (Tenn. 2015)).

Presbyterian Church (U.S.A.), A Corporation, under which Woodland previously was affiliated, is a corporate entity headquartered in Kentucky and incorporated in

---

[9] *International Shoe* also "presaged the development of two categories of personal jurisdiction," now commonly known as general jurisdiction and specific jurisdiction. *Daimler*, 571 U.S. at 126, 134 S.Ct. 746. When a defendant's affiliations with a forum state are so continuous and systematic as to render it essentially at home there, a court may exercise jurisdiction as to any claim against that defendant, even if the incidents underlying the claim occurred in a different state. This category is referred to as general jurisdiction. In contrast, for a court to exercise specific jurisdiction, the suit must arise out of or relate to the defendant's contacts with the forum state. *Bristol-Myers Squibb*, 137 S.Ct. [1773] at 1780 [(2017)]; *Daimler*, 571 U.S. at 127, 134 S.Ct. 746….

Pennsylvania. Evangelical Presbyterian Church, under which Woodland is currently affiliated, is incorporated in the state of Michigan and has its principal place of business in Florida. Plaintiffs assert that these entities are subject to both general and specific jurisdiction in the state of Tennessee. Presbyterian Church (U.S.A.), A Corporation argues that Plaintiffs waived their argument concerning general jurisdiction by failing to raise it below. In Plaintiffs' response below to Presbyterian Church (U.S.A.), A Corporation's motion to dismiss, Plaintiffs stated in part: "There are two kinds of jurisdiction: general and specific. The Plaintiffs contend at a minimum specific jurisdiction exists over the Presbyterian Church." While Plaintiffs focused mainly on specific jurisdiction below, we do not believe they abandoned or waived any arguments concerning general jurisdiction on appeal. Indeed, Plaintiffs' arguments are very similar as to either basis for personal jurisdiction. We decline to find waiver, and instead consider Plaintiffs' personal jurisdiction issue as a whole.

Neither Presbyterian Church (U.S.A.), A Corporation nor Evangelical Presbyterian Church filed any affidavits or other evidentiary materials outside the pleadings in support of their motions to dismiss contending that the Trial Court lacked personal jurisdiction over them. We are, once again, constrained to rely upon the allegations contained in Plaintiffs' complaint. Plaintiffs alleged that that the institutional defendants acted as agents for one another, and that these bodies are vicariously liable for the religious entities under their care and control. These allegations are a combination of both factual allegations and legal conclusions based on those factual allegations. In their brief, Plaintiffs assert: "The Presbyterian Church which operates in multiple states if not every state should anticipate being brought into court in another jurisdiction other than Kentucky or Pennsylvania. Notions of fair play and substantial justice are not offended by finding specific jurisdiction in this case…. [s]imilarly, the EPC operates in multiple states if not every state, and clearly should anticipate being brought into court in a jurisdiction other than Michigan or Florida." In response, Presbyterian Church (U.S.A.), A Corporation and Evangelical Presbyterian Church both argue that Plaintiffs failed to point to any specific actions they undertook in the state of Tennessee to make them subject to personal jurisdiction here. Without furnishing any additional evidence to the Trial Court by affidavits or other evidentiary material, those two defendants further discount Plaintiffs' characterization of the church structure as being unsupported.

In *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635 (Tenn. 2009), our Supreme Court articulated the presumption of corporate separateness. In *Gordon*, a Kentucky corporation and other Tennessee parties were named defendants in a healthcare liability action filed in the Circuit Court for Davidson County. *Id*. at 641. The trial court granted the Kentucky corporation's motion for summary judgment based on lack of personal

jurisdiction. *Id*.[10] The Supreme Court determined on appeal that "(1) the Kentucky corporation's corporate filings in Kentucky listing the Tennessee address of the legal department of its parent corporation as its current principal office, (2) the fact that many of the corporation's officers and directors maintain offices in Tennessee, and (3) the fact that the Kentucky corporation is a subsidiary and remote subsidiary of two corporations whose primary places of business are in Tennessee are insufficient, individually and collectively, to provide a basis for exercising general personal jurisdiction over the Kentucky corporation." *Id*. In declining to find general personal jurisdiction, our Supreme Court stated:

> A parent corporation's general involvement with the subsidiary corporation's performance, finance and budget decisions, and general policies and procedures does not provide a basis for attributing one corporation's contacts with the forum to the other for the purposes of personal jurisdiction. Neither does the fact that the subsidiary is wholly owned by the parent corporation or the fact that the corporations have the same directors and officers suffice to show that the two are alter egos.

> However, the actions of a parent corporation may be attributable to a subsidiary corporation (1) when one corporation is acting as an agent for the other or (2) when the two corporations are essentially alter egos of each other. An alter ego or agency relationship is typified by the parent corporation's control of the subsidiary corporation's internal affairs or daily operations. The courts have declined to disregard the presumption of corporate separateness in the absence of evidence of the parent corporation's domination of the day-to-day business decisions of the subsidiary corporation.

*Gordon*, 300 S.W.3d at 651-652 (citations and footnotes omitted). In *Hilani v. Greek Orthodox Archdiocese of America*, 863 F.Supp.2d 711 (W.D. Tenn. 2012), the United States District Court for the Western District of Tennessee, applying *Gordon*, stated as follows in deciding that the plaintiff therein failed to establish general personal jurisdiction over the defendant:

> Applying these principles of Tennessee law to the facts presented in this case, the Court holds that Plaintiff has not carried his burden to show that Annunciation Church or any of the parish churches located in Tennessee is simply the alter ego of the Archdiocese. Plaintiff has not proven that

---

[10] On appeal to this Court, we noted that "the issue should have been decided on a motion to dismiss for lack of jurisdiction rather than a motion for summary judgment." *Gordon*, 300 S.W.3d at 642 (citation omitted).

-17-

Annunciation Church is a sham or dummy corporation or that the local church and the Archdiocese are identical and indistinguishable. Rather, Plaintiff relies heavily on the fact that the Archdiocese promulgates regulations and other rules for all local parishes and has the authority to intervene in the affairs of the local churches. Plaintiff then has attempted to show that Annunciation Church is merely an instrumentality, agent, conduit, or adjunct of the Archdiocese. The Court holds that Defendant's ecclesiastical regulations do not establish that Defendant has complete control over the day-to-day affairs or operations of Annunciation Church or any other of its "subsidiaries." There is no evidence that Defendant approves every decision much less directs every action of the local parish church from its headquarters in New York. At most, the regulations prove that Annunciation Church and other parish churches are member institutions within a larger religious body. As such, Annunciation Church and other parish churches have agreed to be bound by the standards and discipline of the Archdiocese. This association includes providing regular monetary support to Defendant. The Court finds this evidence entirely consistent with the ecclesiastical structure of many religious institutions, which by their very nature have elements of a "top-down" organization, insist on uniformity among member institutions, and provide funds for the support of the governing body. Viewing the evidence in the light most favorable to Plaintiff, Defendant does not exert such control over the daily internal affairs of parish churches that the entities can be said to be alter egos. Therefore, the Court concludes that Plaintiff has not overcome the presumption of corporate separateness, and so the Court does not have general personal jurisdiction over Defendant.

*Hilani*, 863 F.Supp.2d at 721-22 (footnote omitted).

While the foregoing cases analyze general personal jurisdiction, we find the analysis conclusive as to both types of personal jurisdiction for purposes of the present case. Plaintiffs simply did not allege that Presbyterian Church (U.S.A.), A Corporation or Evangelical Presbyterian Church did anything in the state of Tennessee so as to make it fair and just for a Tennessee court to exercise personal jurisdiction over them. The presumption of corporate separateness is recognized in Tennessee, and there is no dispute that these are distinct corporate entities. For purposes of establishing personal jurisdiction, Plaintiffs have merely alleged an "ecclesiastical structure" similar to "many religious institutions." *Hilani*, 863 F.Supp.2d at 721-22. That is insufficient to assert personal jurisdiction over out-of-state defendants. Plaintiffs alleged nothing in the way of continuous, systematic, and substantial conduct by these defendants in the state of Tennessee. Plaintiffs alleged that Presbyterian Church (U.S.A.), A Corporation

commissioned a study on sexual abuse in the church in the 1990s, but they did not make any Tennessee-specific allegations. None of these alleged facts suggest anything like the minimum, sufficient contacts necessary to establish personal jurisdiction. Based upon the allegations contained in Plaintiffs' complaint, Presbyterian Church (U.S.A.), A Corporation and the Evangelical Presbyterian Church lack sufficient minimum contacts with Tennessee such that the Trial Court's exercise of personal jurisdiction over these non-resident defendants would be unfair. We affirm the Trial Court's dismissal of Presbyterian Church (U.S.A.), A Corporation and the Evangelical Presbyterian Church on personal jurisdiction grounds.

We next address whether the Trial Court erred in dismissing Plaintiffs' claims against Woodland; The Presbytery of the Mid-South, Inc; Synod of Living Waters Presbyterian Church (U.S.A.), Inc.; and Presbyterian Church (U.S.A.), A Corporation, on grounds that the statute of limitations expired and that no tolling provisions applied to prevent the running of the statute of limitations. We already have affirmed the dismissal of Presbyterian Church (U.S.A.), A Corporation on grounds of lack of personal jurisdiction. Plaintiffs allege that they were first put on notice of their claims against these other defendants within the year before they filed their complaint, and therefore their claims are timely under Tenn. Code Ann. § 28-3-104 with its one-year statute of limitations for personal injury. The claims at issue were dismissed pursuant to Tenn. R. Civ. P. 12.02(6). Regarding our standard of review for motions to dismiss pursuant to Tenn. R. Civ. P. 12.02(6), the Tennessee Supreme Court has instructed:

> A motion to dismiss a complaint for failure to state a claim for which relief may be granted tests the legal sufficiency of the plaintiff's complaint. *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 894 (Tenn. 2011); *cf. Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 406 (Tenn. 2002). The motion requires the court to review the complaint alone. *Highwoods Props., Inc. v. City of Memphis*, 297 S.W.3d 695, 700 (Tenn. 2009). Dismissal under Tenn. R. Civ. P. 12.02(6) is warranted only when the alleged facts will not entitle the plaintiff to relief, *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011), or when the complaint is totally lacking in clarity and specificity, *Dobbs v. Guenther*, 846 S.W.2d 270, 273 (Tenn. Ct. App. 1992) (citing *Smith v. Lincoln Brass Works, Inc.*, 712 S.W.2d 470, 471 (Tenn. 1986)).

> A Tenn. R. Civ. P. 12.02(6) motion admits the truth of all the relevant and material factual allegations in the complaint but asserts that no cause of action arises from these facts. *Brown v. Tennessee Title Loans, Inc.*, 328 S.W.3d 850, 854 (Tenn. 2010); *Highwoods Props., Inc. v. City of Memphis*, 297 S.W.3d at 700. Accordingly, in reviewing a trial court's dismissal of a

complaint under Tenn. R. Civ. P. 12.02(6), we must construe the complaint liberally in favor of the plaintiff by taking all factual allegations in the complaint as true, *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d at 894; *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d at 426; Robert Banks, Jr. & June F. Entman, *Tennessee Civil Procedure* § 5-6(g), at 5-111 (3d ed. 2009). We review the trial court's legal conclusions regarding the adequacy of the complaint de novo without a presumption of correctness. *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d at 895; *Highwoods Props., Inc. v. City of Memphis*, 297 S.W.3d at 700.

*SNPCO, Inc. v. City of Jefferson City*, 363 S.W.3d 467, 472 (Tenn. 2012).

On this issue, Plaintiffs cite among other cases our Supreme Court's Opinion in *Redwing v. Catholic Bishop for the Diocese of Memphis,* 363 S.W.3d 436 (Tenn. 2012). The plaintiff in *Redwing*, Mr. Redwing, sued the Roman Catholic Diocese of Memphis alleging sexual abuse by a priest some thirty years before. *Id*. at 442. Mr. Redwing's allegations included:

> Mr. Redwing alleged that the Diocese breached its fiduciary duties and acted negligently with regard to the hiring, retention, and supervision of Fr. Guthrie. Mr. Redwing also alleged that the Diocese was aware or should have been aware that Fr. Guthrie was "a dangerous sexual predator with a depraved sexual interest in young boys" and that the Diocese misled him and his family regarding its "knowledge of Father Guthrie's history and propensity for committing sexual abuse upon minors." According to Mr. Redwing's complaint, "[a]fter finding out about Father Guthrie's abuse of minors, the Diocese actively took steps to protect Father Guthrie, conceal the Diocese's own wrongdoing in supervising Father Guthrie, and prevent Norman Redwing and other victims of Father Guthrie from filing civil lawsuits."

*Id*. at 442-43. The Diocese filed a motion to dismiss asserting, as relevant for purposes of the appeal at bar, the statute of limitations as a defense. *Id*. at 443. The trial court ruled against the Diocese on its statute of limitations defense. *Id*. The Diocese filed an application for an extraordinary appeal to the Court of Appeals, which was granted. *Id*. at 443-44. The Court of Appeals panel was split on the issue of whether Mr. Redwing's claim was time-barred:

> The majority of the panel concluded that Mr. Redwing was on inquiry notice when he reached the age of majority because he knew he had been abused, he knew who his abuser was, and he knew that his abuser was employed by

-20-

the Diocese. *Redwing v. Catholic Bishop for Diocese of Memphis*, No. [W2009-00986-COA-R10-CV,] 2010 WL 2106222, at *7 [(Tenn. Ct. App. May 27, 2010)]. The majority decided that Mr. Redwing's "conclusory allegation that he exercised reasonable care and diligence is not sufficient to prevent dismissal of the complaint as time-barred [because] the rest of the complaint belies the allegation." *Redwing v. Catholic Bishop for Diocese of Memphis*, 2010 WL 2106222, at *7. In the majority's view, if Mr. Redwing had filed suit when he reached eighteen years of age, "discovery in that case would have 'provided a mechanism for [him] to learn that the Diocese had been negligent.'" *Redwing v. Catholic Bishop for Diocese of Memphis*, 2010 WL 2106222, at *7 (quoting *Doe v. Catholic Bishop for Diocese of Memphis*, 306 S.W.3d 712, 730 (Tenn. Ct. App. 2008)).

> In her dissenting opinion, Judge Kirby concluded that the majority's dismissal of Mr. Redwing's claims was premature in the context of an appeal of a motion to dismiss. *Redwing v. Catholic Bishop for Diocese of Memphis*, 2010 WL 2106222, at *10. Judge Kirby noted that Mr. Redwing had alleged in his complaint that the Diocese had undertaken to conceal its wrongdoing and that the Diocese had misled Mr. Redwing. *Redwing v. Catholic Bishop for Diocese of Memphis*, 2010 WL 2106222, at *8. Judge Kirby also concluded that Mr. Redwing was not on inquiry notice with regard to the Diocese's wrongdoing and that even if Mr. Redwing had promptly filed a lawsuit that he likely would not have discovered the Diocese's involvement. *Redwing v. Catholic Bishop for Diocese of Memphis*, 2010 WL 2106222, at *9.

*Redwing*, 363 S.W.3d at 444. Mr. Redwing filed a Tenn. R. App. P. 11 application for permission to appeal to the Tennessee Supreme Court, which was granted. *Id*. In its Opinion, the Tennessee Supreme Court articulated the doctrines of equitable estoppel and fraudulent concealment—doctrines allowing a plaintiff in certain circumstances to overcome the expiration of the statute of limitations otherwise— as follows:

> The doctrine of equitable estoppel applies only when the defendant engages in misconduct. *B & B Enters. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d [839] at 849 [(Tenn. 2010)] (quoting *Norton v. Everhart*, 895 S.W.2d [317] at 321 [(Tenn. 1995)]. Examples of circumstances which have prompted the courts to invoke the doctrine of equitable estoppel to prevent a defendant from asserting a statute of limitations defense include: (1) when a defendant promises not to assert a statute of limitations defense, (2) when a defendant promises to pay or otherwise satisfy the plaintiff's claim without requiring the plaintiff to file

suit, and (3) when a defendant promises to settle a claim without litigation following the conclusion of another proceeding between the defendant and a third party.

In the context of defenses predicated on a statute of limitations, the doctrine of equitable estoppel always involves allegations that the defendant misled the plaintiff. *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d [141] at 146 [(Tenn. 2001)]. The focus of an equitable estoppel inquiry "is on the defendant's conduct and the reasonableness of the plaintiff's reliance on that conduct." *Hardcastle v. Harris*, 170 S.W.3d [67] at 85 [(Tenn. Ct. App. 2004)]; *see also Fahrner v. SW Mfg., Inc.*, 48 S.W.3d at 146. Determining whether to invoke the doctrine of equitable estoppel to counter a statute of limitations defense requires the courts to examine the facts and circumstances of the case to determine whether the defendant's conduct is sufficiently unfair or misleading to outweigh the public policy favoring the enforcement of statutes of limitations. *Hardcastle v. Harris*, 170 S.W.3d at 85.

Plaintiffs asserting equitable estoppel must have acted diligently in pursuing their claims both before and after the defendant induced them to refrain from filing suit. The statute of limitations is tolled for the period during which the defendant misled the plaintiff. *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d at 146; *Lusk v. Consolidated Aluminum Corp.*, 655 S.W.2d 917, 920-21 (Tenn. 1983). The plaintiff must demonstrate that suit was timely filed after the plaintiff knew or, in the exercise of reasonable diligence, should have known that the conduct giving rise to the equitable estoppel claim had ceased to be operational. *See Ingram v. Earthman*, 993 S.W.2d at 633. At the point when the plaintiff knows or should know that the defendant has misled him or her, the original statute of limitations begins to run anew, and the plaintiff must file his or her claim within the statutory limitations period. *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d at 146.

***

A claim of fraudulent concealment to toll the running of a statute of limitations contains four elements. The plaintiff invoking the fraudulent concealment doctrine must allege and prove: (1) that the defendant affirmatively concealed the plaintiff's injury or the identity of the wrongdoer or failed to disclose material facts regarding the injury or the wrongdoer despite a duty to do so; (2) that the plaintiff could not have discovered the injury or the identity of the wrongdoer despite reasonable care and diligence;

(3) that the defendant knew that the plaintiff had been injured and the identity of the wrongdoer; and (4) that the defendant concealed material information from the plaintiff by "'withholding information or making use of some device to mislead' the plaintiff in order to exclude suspicion or prevent inquiry."

Plaintiffs asserting the doctrine of fraudulent concealment to toll the running of a statute of limitations must demonstrate that they exercised reasonable care and diligence in pursuing their claim. *See Vance v. Schulder*, 547 S.W.2d 927, 930 (Tenn. 1977); *Ray v. Scheibert*, 224 Tenn. 99, 104, 450 S.W.2d 578, 580-81 (1969). The statute of limitations is tolled until the plaintiff discovers or, in the exercise of reasonable diligence, should have discovered the defendant's fraudulent concealment or sufficient facts to put the plaintiff on actual or inquiry notice of his or her claim. *See Fahrner v. SW Mfg., Inc.*, 48 S.W.3d at 145. At the point when the plaintiff discovers or should have discovered the defendant's fraudulent concealment or sufficient facts to put the plaintiff on actual or inquiry notice of his or her claim, the original statute of limitations begins to run anew, and the plaintiff must file his or her claim within the statutory limitations period.

*Redwing*, 363 S.W.3d at 460-63 (footnotes omitted). The Tennessee Supreme Court concluded that the Court of Appeals erred by dismissing Mr. Redwing's complaint based upon the running of the statute of limitations "at this stage of the proceeding." *Id*. at 467. The Tennessee Supreme Court reviewed Mr. Redwing's allegations:

Mr. Redwing's amended complaint contains numerous allegations against the Roman Catholic Church in general and the Diocese in particular. With regard to the Roman Catholic Church, the complaint states that

It is the practice of the Roman Catholic Church, through its cardinals, bishops, priests and other officials and agents, to conceal instances of child sexual abuse and complaints by victims. [The Roman Catholic Church] zealously maintains the secrecy of the horrifying truth of rampant child sexual abuse in The Church, by among other things:

• Failing to disclose complaints to law enforcement officials, parishioners and the public;
• Maintaining secret archives and files of evidence of sex abuse, accessible only to the bishops;

> • Instructing Church officials in destruction of incriminating documents and spoliation of evidence regarding sexual abuse by clergy;
> • Transferring sex offending clergy to The Church facilities in other locations where their pasts would not be known to parishioners, and the abusers would have a "fresh start" with a new group of vulnerable children;
> • Threatening and coercing victims and their families to withdraw complaints and retract allegations of sexual abuse;
> • Paying "hush money" to victims and their families, in exchange for promises of non-disclosure and confidentiality.

With specific regard to the Diocese, Mr. Redwing's complaint alleges that

> At the time that Mr. Redwing was abused by Father Guthrie, Mr. Redwing and/or his family were unaware of the Diocese's knowledge of Father Guthrie's sexual interest in young boys. In fact, Mr. Redwing and/or his family were misled by the Diocese with regard to the Diocese's knowledge of Father Guthrie's history and propensity for committing sexual abuse upon minors.

> After finding out about Father Guthrie's abuse of minors, the Diocese actively took steps to protect Father Guthrie, conceal the Diocese's own wrongdoing in supervising Father Guthrie, and prevent Norman Redwing and other victims of Father Guthrie from filing civil lawsuits.

*Redwing*, 363 S.W.3d at 465-66. Our Supreme Court stated that whether Mr. Redwing exercised reasonable diligence to discover his claims against the Diocese was a question of fact. *Id.* at 466. Since the matter was disposed of at the motion to dismiss stage, the facts available were limited to those contained in Mr. Redwing's amended complaint. *Id.* The Tennessee Supreme Court concluded:

> Ultimately, the decisions regarding the Diocese's alleged fraudulent concealment of its knowledge of and responsibility for Fr. Guthrie's conduct and Mr. Redwing's diligence in pursuing his claim against the Diocese will require further development of the facts through discovery. The current record contains no information regarding (1) when and how Mr. Redwing or his parents asked the Diocese about its knowledge of Fr. Guthrie's conduct, (2) the manner in which the Diocese misled Mr. Redwing or his parents, (3)

the steps Mr. Redwing took to pursue claims against Fr. Guthrie prior to Fr. Guthrie's death, (4) when and under what circumstances Mr. Redwing learned or should have learned about the public accounts of the charges that the Roman Catholic Church was engaged in a systematic cover-up of its knowledge of and responsibility for the acts of child abuse committed by its priests, and (5) when and under what circumstances Mr. Redwing learned or should have learned that the Diocese was engaging in the same conduct allegedly engaged in by the Roman Catholic Church.

Because the Diocese has made out a prima facie statute of limitations defense, the burden is on Mr. Redwing to demonstrate that his claims against the Diocese should not be time-barred. Our denial of the Diocese's motion to dismiss does not prevent the Diocese from continuing to assert its statute of limitations defense or to again pursue this defense by motion or otherwise once all the relevant facts are known. However, at this stage of the proceeding, we find that the Court of Appeals erred by dismissing Mr. Redwing's complaint based on the running of the statute of limitations.

*Redwing*, 363 S.W.3d at 467.

We agree with Plaintiffs that *Redwing* is highly instructive and controlling to the appeal at bar. Both *Redwing* and the present case concern allegations of an institutional cover-up of child sexual abuse perpetrated by a clergyman and a question of whether the applicable statute of limitations was tolled. Just like the plaintiff in *Redwing*, Plaintiffs "knew [they were] abused, knew the identity of the abuser, and knew the abuser was an employee of the employer." *Id*. at 464 (quoting *Redwing v. Catholic Bishop for Diocese of Memphis*, W2009-00986-COA-R10-CV, 2010 WL 2106222, at *7 (Tenn. Ct. App. May 27, 2010)). Based upon their complaint, Plaintiffs knew they were abused at the time; knew Stanford abused them; and knew Stanford was Woodland's pastor. However, our Supreme Court in *Redwing* determined that this factual scenario was not dispositive of whether the statute of limitations had run. The High Court traced the development of the discovery rule, which replaced the harsher accrual rule that preceded it. *Redwing*, 363 S.W.3d at 458. Without a tolling theory, or application of the discovery rule, Plaintiffs' 2020 lawsuit for events alleged to have occurred in the 1990s would be time-barred given the applicable one-year statute of limitations which would have begun to run upon Plaintiffs' attaining majority age.[11] Plaintiffs do assert such theories; they assert both fraudulent concealment and equitable estoppel.

---

[11] For the youngest Plaintiff, this would have been circa 2003.

-25-

In its brief on appeal, Woodland attempts to distinguish *Redwing* from the present case. Woodland states that, based upon the allegations in Plaintiffs' complaint, Plaintiffs knew in the 1990s that their claims were not taken seriously by the church; that the Presbyterian Church's alleged knowledge of sexual abuse was not unavailable to Plaintiffs due to any fraud; that Plaintiffs knew first-hand that Woodland did not have any effective policies to protect them at the time; and that Plaintiffs failed to exercise reasonable care and diligence in pursuing their claim by waiting some two decades to sue.

As this case was disposed of at the motion to dismiss stage, we examine Plaintiffs' complaint to determine whether Plaintiffs have successfully alleged fraudulent concealment. Plaintiffs alleged, among many other things, that "[i]n the summer of 2019, the Plaintiffs were told by former Woodland Presbyterian pastor John Sowers that a 'full investigation' was done at the time the complaints were made in the 1990s"; that "[t]he Plaintiffs recently learned that the 'full investigation' was a complete 'whitewash'"; that "[u]pon information and belief efforts were undertaken to conceal and hide this illegal and heinous activity"; and that "Woodland Presbyterian Church, including its Session, the Presbytery of the Mid-South, Synod of Living Waters, Presbyterian Church (U.S.A.), and their agents and employees were aware of the risks of clergy abuse in the Presbyterian Church in the early 1990s prior to their abuse but failed to implement policies that would protect its own members, including them." Plaintiffs' allegations that "efforts were undertaken to conceal and hide this illegal and heinous activity" and that the investigation was a "whitewash,"[12] factual allegations we are bound to accept as true at the motion to dismiss stage, are supportive of fraudulent concealment.

In *Redwing*, our Supreme Court articulated the elements necessary to establish fraudulent concealment, as set out above. In line with those elements, Plaintiffs' complaint alleges (1) that the institutional defendants in question failed to disclose and/or concealed material facts regarding the injury or the wrongdoer despite a duty to do so; (2) that Plaintiffs could not have discovered the institutional conduct despite reasonable care and diligence in view of the "whitewash"; (3) that the institutional defendants in question knew or should have known of the sexual abuse in the church to include Plaintiffs' allegations against Stanford; and (4) that the institutional defendants in question concealed material information from Plaintiffs by means of a "whitewash." In addition, Plaintiffs allege they discovered in June 2019 new information about their experiences when John Doe 3 contacted Pastor Matt Miller at Woodland and was told Miller believed Plaintiffs because he had heard stories supporting their claims. Whether Plaintiffs can substantiate their claims is another matter, but at this stage they have alleged that The Presbytery of the Mid-South, Inc., and Synod of Living Waters Presbyterian Church (U.S.A.), Inc. are liable for

_____

[12] "Whitewash" means "to gloss over or cover up (something, such as a record of criminal behavior)," or, as a noun, "an act or instance of glossing over or of exonerating." MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/whitewash (last accessed May 31, 2022).

Woodland's conduct based upon principles of agency and vicarious liability. Plaintiffs' factual allegations related to agency and vicarious liability as well as these defendants' own negligence, while not richly detailed as to the Presbyterian Church's structure, are sufficient to withstand the institutional defendants' motions to dismiss for failure to state a claim.

Plaintiffs' allegations are not identical to those in *Redwing*, but they are sufficiently analogous. We are obliged to adhere to our Supreme Court's precedents, and *Redwing* has never been overruled. Plaintiffs have successfully alleged that the applicable one-year statute of limitations did not begin to run until June 2019 due to fraudulent concealment.[13] We take no position on the merits of Plaintiffs' lawsuit, and the institutional defendants may yet successfully assert their statute of limitations defense in this case. However, consonant with our Supreme Court's Opinion in *Redwing*, we hold that dismissal of Plaintiffs' complaint based upon the running of the statute of limitations was premature at the motion to dismiss stage given the factual allegations contained in Plaintiffs' complaint. We reverse the Trial Court's dismissal of Plaintiffs' complaint based upon the running of the statute of limitations against Woodland; The Presbytery of the Mid-South, Inc; and Synod of Living Waters Presbyterian Church (U.S.A.), Inc.

We next address whether the Trial Court erred in dismissing Plaintiffs' negligent infliction of emotional distress claim from 2019 against Woodland; Presbytery of the Central South, Inc.; and Evangelical Presbyterian Church. We already have affirmed the dismissal of Evangelical Presbyterian Church on personal jurisdiction grounds. "The elements of a claim for negligent infliction of emotional distress include the elements of a general negligence claim, which are duty, breach of duty, injury or loss, causation in fact, and proximate causation." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 206 (Tenn. 2012) (citation and footnote omitted). The plaintiff must also prove that the defendant's negligence caused the plaintiff "serious or severe emotional injury." *Id.* (citation and footnote omitted). Plaintiffs alleged that Woodland disclosed their names to the media in 2019, and that Presbytery of the Central South, Inc. is vicariously liable because Woodland is a member of that body. Woodland argues in its brief that Plaintiffs failed to established that Woodland had any legal duty toward Plaintiffs in 2019; that no special relationship such as the clergy-parishioner relationship existed between Woodland and Plaintiffs in 2019; that the alleged release of Plaintiffs' names was not so extreme or outrageous as to

---

[13] Plaintiffs also relied upon the doctrine of equitable estoppel, although they did not pursue that argument with the same vigor as that for fraudulent concealment. In *Redwing*, our Supreme Court found that "[t]he factual allegations in Mr. Redwing's amended complaint are inconsistent with an equitable estoppel claim" and "[t]his lack of knowledge, while not inconsistent with a fraudulent concealment claim, undermines his equitable estoppel claim because knowledge of a claim against the defendant prior to the running of the statute of limitations is a necessary ingredient of an equitable estoppel claim." 363 S.W.3d at 465. We find the same logic holds true in the appeal at bar. The doctrine of equitable estoppel is unavailing to Plaintiffs.

cause a reasonable person to suffer serious or severe emotional injury; and that Plaintiffs did not allege that the media disseminated their names to the public.

With respect to the question of Woodland's duty of care to Plaintiffs in 2019, our Supreme Court in *Redwing* stated that "[a] religious institution's fiduciary obligations cannot be predicated on a religious duty and cannot arise solely from the relationship between the institution and its members." 363 S.W.3d at 455. However, we do not interpret our Supreme Court's instructions regarding a religious institution's fiduciary obligations to exclude the possibility that Woodland owed a duty of care to Plaintiffs in 2019 on grounds other than those ruled out in *Redwing*. In *Marla H. v. Knox County*, 361 S.W.3d 518, 521 (Tenn. Ct. App. 2011), which involved an action for negligent infliction of emotional distress, this Court addressed whether a school resource officer owed a duty to exercise reasonable care when showing graphic accident photographs to a class of seventh grade students and whether that duty was breached. One of the photographs was of a student's deceased father. *Id*. We reversed the trial court's finding at a bench trial that the school resource officer failed to exercise reasonable care. *Id*. However, we concluded that the officer did owe a duty. *Id*. In our discussion of the issue, we noted that whether a duty of care exists is a question of law which we review de novo, and "'[w]hen the existence of a particular duty is not a given or when the rules of the established precedents are not readily applicable, courts will turn to public policy for guidance.'" *Id*. at 531, 534 (quoting *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 365 (Tenn. 2008); additional citation omitted). This Court further set out a number of factors to consider in determining whether a duty of care exists:

(1) the foreseeable probability of the harm or injury occurring; (2) the possible magnitude of the potential harm or injury; (3) the importance or social value of the activity engaged in by the defendant; (4) the usefulness of the conduct to the defendant; (5) the feasibility of alternative conduct that is safer; (6) the relative costs and burdens associated with that safer conduct; (7) the relative usefulness of the safer conduct; and (8) the relative safety of alternative conduct.

*Marla H.*, 361 S.W.3d at 531 (quoting *Satterfield*, 266 S.W.3d at 365).

In the present case, Plaintiffs have alleged that Woodland released their names to the media, causing them emotional distress. We have little difficulty concluding that releasing Plaintiffs' names to the media could, foreseeably, cause them significant emotional distress. We also are hard-pressed to identify the importance or social value attendant to Woodland's releasing the names of alleged sexual abuse victims to the media, or how that would be useful to Woodland. On the contrary, the socially useful or valuable activity would be that of encouraging victims of sexual abuse and alleged institutional

-28-

cover-up to come forward, not chilling disclosure by releasing their names to the media so they might well have to relive their experiences exposed in the public eye. As to safer, more feasible and useful alternative conduct, it is unclear how the conduct alleged was either useful or necessary to begin with so as to warrant an alternative—based on Plaintiffs' complaint, Woodland could simply have refrained from releasing Plaintiffs' names to the media. We conclude that Woodland owed Plaintiffs a duty of reasonable care in safeguarding Plaintiffs' identities. In addition, while Plaintiffs' not alleging that the media further disseminated their names may be relevant to damages, it is not dispositive as to whether a duty existed. Our conclusion that Woodland owed Plaintiffs a duty of care in 2019 in no way derives from Plaintiffs' former membership or attendance of, or religious relationship with, Woodland. Our conclusion would be the same if Woodland were a secular organization facing the same allegations.

We further disagree with Woodland in its contention that the act of releasing Plaintiffs' names to the media was insufficiently extreme or outrageous to sustain a claim of negligent infliction of emotional distress. While Woodland notes correctly that "[v]iable NIED claims commonly arise from extreme and outrageous events resulting in death, dismemberment, or serious physical injury to someone other than the named plaintiff" (citations omitted), Tennessee law does not preclude the possibility that a negligent infliction of emotional distress claim may be based upon the kind of conduct asserted here. With respect to Presbytery of the Central South, Inc., Plaintiffs have alleged it is liable as well through principles of agency and vicarious liability. We are ill-suited at this stage of the proceedings to tease out the relationship between Woodland and this Tennessee-based organization, Presbytery of the Central South, Inc. Plaintiffs have alleged enough to survive these defendants' motions to dismiss for failure to state a claim with respect to negligent infliction of emotional distress. We reverse the Trial Court in its dismissal of Plaintiffs' negligent infliction of emotional distress claim against Woodland and Presbytery of the Central South, Inc.

The fourth and final issue we address is whether the Trial Court abused its discretion, both in denying Plaintiffs discovery and in declining to enter default judgment against Stanford. As we reverse in significant part the Trial Court's judgment and remand this case to the Trial Court for further proceedings consistent with this Opinion, we vacate the Trial Court's orders on discovery and Plaintiffs' motion for default judgment against Stanford for these issues to be considered anew on remand in light of our Opinion.

## Conclusion

We affirm the Trial Court's dismissal of Presbyterian Church (U.S.A.), A Corporation and Evangelical Presbyterian Church. We reverse the Trial Court's dismissal of Woodland Presbyterian Church; The Presbytery of the Mid-South, Inc.; Synod of Living Waters Presbyterian Church (U.S.A.), Inc.; and Presbytery of the Central South, Inc. This cause is remanded to the Trial Court for collection of the costs below and for further proceedings consistent with this Opinion. The costs on appeal are assessed against the Appellees, Woodland Presbyterian Church; The Presbytery of the Mid-South, Inc.; Synod of Living Waters Presbyterian Church (U.S.A.), Inc.; and Presbytery of the Central South, Inc.

_____
D. MICHAEL SWINEY, CHIEF JUDGE